**Richard C. Hunt,** OSB No. 68077
rhunt@barran.com
**Paula A. Barran,** OSB No. 80397
pbarran@barran.com
**Edwin A. Harnden,** OSB No. 72112
eharnden@barran.com
Barran Liebman LLP
601 SW Second Avenue
Suite 2300
Portland, Oregon  97204-3159
Telephone: (503) 228-0500
Facsimile:  (503) 274-1212
  Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **ENTERCOM COMMUNICATIONS CORP.; ENTERCOM SAN FRANCISCO, LLC; ENTERCOM SEATTLE, LLC;** and **ENTERCOM PORTLAND, LLC,** <br><br> Plaintiffs, <br><br> v. <br><br> **SCOTT MAHALICK**, **LARRY WILSON, ROBERT PROFFITT,** and **ALPHA BROADCASTING, LLC,** <br><br> Defendants. | **CV. 09-1050 HA** <br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)** |

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................... 1

II.   ADMITTED AND UNDISPUTED FACTS ..................................................................... 2

A.   Mahalick entered into a fixed term agreement with Entercom but
     quit on August 14, 2009 after lying to Entercom about what he was doing....................... 2

B.   Mahalick spent several months of his Entercom employment helping Alpha plan its
     attack on Entercom's competitive position in the Portland marketplace............................ 3

C.   The Alpha Parties actively encouraged Mahalick's breaches.............................................. 6

D.   Alpha's use of Entercom's Registered Trademark ........................................................... 10

III. DISCUSSION ................................................................................................................... 12

A.   Mahalick breached his Employment Agreement with Entercom
     (First Claim for Relief) .................................................................................................... 12

     1.    Term of Agreement.................................................................................................. 12

     2.    Exclusivity .............................................................................................................. 13

     3.    Confidentiality ........................................................................................................ 14

     4.    Summary.................................................................................................................. 14

B.   Mahalick breached his fiduciary duty and his duty of loyalty to
     plaintiffs (Second Claim for Relief) (Mahalick).............................................................. 15

C.   The Alpha Parties are liable for aiding and abetting Mahalick's
     breach of fiduciary duty (Eighth Claim for Relief) ......................................................... 18

D.   The Alpha Parties intentionally interfered with Entercom's contract and
     prospective economic relations with Mahalick (Fifth Claim for Relief: Count One) ...... 20

E.   Plaintiffs are entitled to partial summary judgment against Alpha for
     federal trademark infringement (Ninth Claim for Relief)................................................. 23

     1.    Similarity of the Marks ........................................................................................... 25

     2.    Relatedness or proximity of the parties' services .................................................... 25

     3.    Similarity of trade or marketing channels................................................................ 26

     4.    Defendants' intent.................................................................................................... 26

     5.    Strength of Mark ..................................................................................................... 26

00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

6.  Actual confusion ............................................................................................. 27

7.  Degree of care exercised by the average purchaser ....................................... 27

8.  Likelihood of expansion into other markets ................................................. 27

F.  Plaintiffs are entitled to partial summary judgment on plaintiffs'
    claim of federal unfair competition (Tenth Claim for Relief) .......................................... 28

1.  Plaintiffs own a valid, protectable interest in the Mark
    BEAT THE BANK under common law (Tenth Claim for Relief).............................. 28

2.  There is a likelihood of confusion as a matter of law.................................................. 28

IV. CONCLUSION.......................................................................................................... 29

Page ii – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

# TABLE OF AUTHORITIES

Page

Cases

*American Republic Ins. Co. v. Union Fidelity Life Ins. Co.*, 470 F.2d 820 (9th Cir. 1972) ......... 18

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979),
    abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prod.*,
    353 F.3d 792 (9th Cir. 2003) ................................................................................ 23, 24, 25, 28

*Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or. App. 371, 879 P2d 1288 (1994) ................................ 22

*Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921 (1966) ............... 18

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999).......... 26, 27

*Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 537 P.2d 865 (1975) ........................... 22

*Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th 1138, 26 Cal.Rptr.3d 401
    (Cal.App. 4 Dist. 2005)............................................................................................................ 19

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988)........................ 23, 24, 27

*City of Hope Nat. Medical Center v. Genentech, Inc.*, 43 Cal.4th 375, 181 P.3d 142,
    75 Cal.Rptr.3d 333 (Cal. 2008)............................................................................................... 15

*Dennison v. Angier*, Civil No. 07-6360-AA, 2008 WL 2166525
    (D.Or. May 20, 2008) ................................................................................................... 23, 24, 26

*Financial Programs, Inc. v. Falcon Financial Services, Inc.*, 371 F.Supp. 770
    (D.Or. 1974).............................................................................................................................. 17

*Florists' Transworld Delivery, Inc. v. Clarence Walker For Flowers Inc.*,
    No. 03-807-KI, 2008 WL 1875788 (D.Or. Aug. 5, 2005)................................................. 24, 27

*Fowler v. Varian Associates, Inc.*, 196 Cal.App.3d 34, 241 Cal.Rptr. 539
    (Cal.App. 6 Dist. 1987)...................................................................................................... 14, 15

*Granewich v. Harding*, 329 Or. 47, 985 P.2d 788 (1999) .......................................................18-19

*Horton v. Whitehill*, 121 Or.App. 336, 854 P.2d 977 (1993)........................................................ 16

*J.C. Peacock, Inc. v. Hasko*, 196 Cal.App.2d 353, 16 Cal.Rptr. 518 (1961)................................ 16

*Kamin v. Kuhnau*, 232 Or. 139, 374 P.2d 912 (1962) ............................................................ 17, 18

*Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 733 P2d 430 (1987) ...................................... 22

Page iii – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

*MCA Records, Inc. v. Newton-John*, 90 Cal.App.3d 18, 153 Cal.Rptr. 153
(Cal.App. 1979) ................................................................................................................. 12

*McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841 (1995) ...................................................... 21

*Mega Life and Health Ins. Co. v. Superior Court*, 172 Cal.App.4th 1522,
92 Cal.Rptr.3d 399 (Cal.App. 4 Dist. 2009) ............................................................................. 15

*Miller v. Mill Creek Homes, Inc.*, 195 Or.App. 310, 97 P.3d 687 (Or.App. 2004) ..................... 16

*Motevalli v. Los Angeles Unified School Dist.*, 122 Cal.App.4th 97,
18 Cal.Rptr.3d 562 (Cal.App. 2 Dist. 2004) ............................................................................. 12

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118,
270 Cal.Rptr. 1, 791 P.2d 587 (1990) ................................................................................ 21, 22

*Paramount Mfg. Co. v. Mohan*, 196 Cal.App.2d 372, 16 Cal.Rptr. 417
(Cal.App. 1961) ................................................................................................................. 17

*Purolator Products, Inc. v. Torite Industries, Inc.*, 413 F.2d 989 (9th Cir. 1969) ...................... 16

*Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 960 P.2d 513,
77 Cal.Rptr.2d 709 (1998) ................................................................................................... 21

*Reynolds v. Schrock*, 341 Or. 338, 142 P.3d 1062 (2006) ............................................................ 19

*Sequoia Vacuum Systems v. Stransk*, 229 Cal.App.2d 281, 40 Cal.Rptr. 203 (1964) .................. 13

*Service Employees Intern. Union, Local 250 v. Colcord*, 160 Cal.App.4th 362,
72 Cal.Rptr.3d 763 (Cal.App. 1 Dist. 2008) ........................................................................ 16-17

*Stigall v. City of Taft*, 58 Cal. 2d 565, 25 Cal. Rptr. 441, 375 P.2d 289 (1962) ........................... 16

*Stokes v. Dole Nut Co.*, 41 Cal.App.4th 285, 48 Cal.Rptr.2d 673
(Cal.App. 3 Dist. 1995) ........................................................................................... 13, 15, 16

*Symantec Corp. v. CD Micro, Inc.*, 286 F. Supp. 2d 1265 (D.Or. 2003) ..................................... 28

*Thomas v. Bourdette*, 45 Or.App. 195, 608 P.2d 178 (1980) ....................................................... 16

*Wieber v. FedEx Ground Package System, Inc.*, 231 Or. App. 469,
220 P.3d 68 (2009) ........................................................................................................ 21, 22

*Wrenn v. Boy Scouts of Am.*, No. C 03-04057 JSW, 2008 WL 4792683
(N.D. Cal. Oct. 28, 2008) ..................................................................................................... 27

*Youst v. Longo*, 43 Cal.3d 64, 233 Cal.Rptr. 294, 729 P.2d 728 (1987) ....................................... 22

Page iv – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

Other Authorities

15 U.S.C. § 1057(b) ................................................................................................................... 25

15 U.S.C. § 1114 ....................................................................................................................... 23

15 U.S.C. § 1114(1) ............................................................................................................ 23, 25

15 U.S.C. § 1125 ....................................................................................................................... 23

15 U.S.C. § 1125(a) ........................................................................................................... 23, 28

Cal Bus. and Prof. Code, § 6600 ............................................................................................... 13

Cal. Labor Code § 2920 ............................................................................................................ 12

Rest.2d Agency, § 403 ............................................................................................................... 16

Page v – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

# I. INTRODUCTION

Plaintiffs file this memorandum in support of their motion for partial summary judgment against defendant Scott Mahalick ("Mahalick") and defendants Larry Wilson ("Wilson"), Robert Proffitt ("Proffitt"), and Alpha Broadcasting, LLC ("Alpha") (collectively the "Alpha Parties"). Plaintiffs move for partial summary judgment on liability on their claims against Mahalick for breach of contract, breach of the duty of loyalty, and breach of fiduciary duty. Plaintiffs also move for partial summary judgment on liability on their claims against the Alpha Parties for interference with contract, aiding and abetting Mahalick's breach of fiduciary duty, and for the Alpha Parties' violation of Entercom's registered trademark and the related federal unfair competition. Because the material facts are either admitted or undisputed, there are no genuine issues of material fact, and plaintiffs are entitled to partial summary judgment on liability on these claims as a matter of law.

The undisputed facts show that Mahalick was in a trusted – and very generously compensated – relationship with Entercom, but when he was presented with the opportunity to provide critical support to one of Entercom's direct competitors, he secretly began to work with Larry Wilson and the other Alpha Parties to assist them in their preparations to compete head-on with Entercom in Portland's radio market. The Alpha Parties, for their part, encouraged him to send them confidential Entercom information, assigned him research and other projects, and invited him to a key Alpha meeting. All of this was on Entercom's dime, because Mahalick was still working for Entercom under the terms of a written employment agreement that still had nearly a year to go. Mahalick covered up what he was doing while he worked for Entercom, eventually walked out on his fixed term employment agreement, and promptly destroyed evidence of his wrongdoing despite his knowledge (and that of his counsel) that Entercom intended to institute litigation against him.

Mahalick's misconduct – and the Alpha Parties' active encouragement of it – started in March, 2009, when Mahalick still had 11 months left on his Entercom employment contract.

Page 1 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC                          BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Mahalick finally walked out on his Entercom contract on August 14, 2009 with 197 days left to run to become Alpha's Portland Program director. After Mahalick formally joined Alpha, the Alpha Parties ran a series of promotions, using Entercom's registered trademark.

## II. ADMITTED AND UNDISPUTED FACTS

### A. Mahalick entered into a fixed term agreement with Entercom but quit on August 14, 2009 after lying to Entercom about what he was doing.

Mahalick admits he was employed under a fixed term agreement with Entercom San Francisco and Entercom Seattle that extended to February 27, 2010 *(Answer, ¶¶ 22-25).*[1] He was the Program Director for Entercom's Seattle and San Francisco radio stations *(Answer, ¶¶ 18-20).* The terms of Mahalick's employment agreement are not in dispute; the agreement was in writing and is attached to the First Amended Complaint. In addition to specifying a fixed duration, the agreement required Mahalick to work exclusively for Entercom during the term of the agreement (with certain limited exceptions not relevant here), and to keep Entercom's business information confidential. See the provisions of the admitted Exs. 1-4 of the First Amended Complaint, specifically Ex. 1, ¶¶ 1, 5, 7 and 9.

On August 13, 2009 (with many months still to go on the employment agreement) Dwight Walker (Mahalick's boss) emailed him to remind Mahalick of his obligations under the employment agreement. Mahalick apparently bristled at the suggestion that he might violate his agreement and responded to Walker that:

> "I NEVER at anytime mentioned consulting services for Alpha Broadcasting! I would never do anything that would be in conflict with my employment agreement. That is why I am asking to be released from my agreement early. <u>I intend not to renew my current agreement and intend to leave at the end of the term on 2/27/2010.</u>" *(Answer, ¶ 47 (emphasis added))*

---

[1] Where facts are admitted, Plaintiffs' reference to "*Answer*" is to Mahalick's Answer to the First Amended Complaint.

00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Mahalick resigned the next day (*Answer, ¶ 68*) and within two business days was the Director of FM Programming for Alpha and Program and Director of Alpha's competing Portland country music station, KUPL *(Answer, ¶¶ 9, 71)*.

Mahalick shared copies of his employment agreement with Larry Wilson himself *(Answer, ¶ 35)*. Wilson, who is Alpha's principal owner, formerly was a practicing attorney and General Counsel for a radio broadcast company; he told Mahalick that unless he was released from his agreement with Entercom, he could not work for Wilson *(Tr. 80:17-25)*.[2]

**B.    Mahalick spent several months of his Entercom employment helping Alpha plan its attack on Entercom's competitive position in the Portland marketplace.**

Mahalick may have been an Entercom employee up to August 14, 2009, but he did not act like one. In the months and weeks before he formally resigned, he repeatedly used his best efforts to assist Alpha's competitive position. His admitted and undisputed actions include the following:

- In or about April, 2009, Mahalick attended a meeting at Wilson's invitation. The topic of discussion was Wilson's planned acquisition of a large radio broadcast group *(Answer, ¶ 52)*.

- From about May, 2009 until he left Entercom in August, 2009, Mahalick passed on information to Alpha about certain vendors that Alpha might want to engage *(Answer, ¶ 53)*.

- In June, 2009 he enthusiastically recommended that Alpha hire one of Entercom's up and coming "superstars" (his word), Keola Lui-Kwan, at the same time telling his Entercom boss that Lui-Kwan's performance was questionable and, therefore, not worthy

---

[2] All transcript references and deposition exhibit references are to the deposition of Scott Mahalick. True copies of excerpts from the transcript of the deposition of Scott Mahalick and certain exhibits to that deposition are attached as Exhibit 1 to the Declaration of Richard C. Hunt ("*Hunt Decl.*") filed herewith.

of a contract extension. *(Answer, ¶¶ 57, 58; Hunt Decl., Ex. 2).*[3]  Entercom relied upon the negative comments regarding Lui-Kwan, did not extend the term of his employment agreement, and shortly after Mahalick joined Alpha, Alpha swooped in and hired Lui-Kwan to compete directly with Entercom in Portland *(Answer, ¶ 59).* On or about July 11, 2009 – more than a month before he stopped pocketing his Entercom salary – Mahalick sent a memorandum to Wilson and Proffitt setting forth his comments regarding strengths and weaknesses of the CBS (soon-to-be Alpha) country music station in Portland, Oregon and comparing that station to the strengths and weaknesses of its direct competitor in that market, Entercom's country music in Portland, KWJJ *(Hunt Decl., Ex. 3).*  After spending days, on Entercom's dime, listening to stations in the Portland market, Mahalick was able to list six strengths and eight weakness of Entercom's country music station and a similar number of strengths and weakness of the country music station Alpha was about to acquire *(Hunt Decl., Ex. 3, pp. 2-7).*  He was also able to make a number of suggestions -- to Alpha -- of ways that Entercom might improve its station and competitive advantage.  Apparently oblivious to the fact that Entercom, not Alpha, was paying his salary at the time, Mahalick repeatedly commented on the fact that he would not share his thoughts with Entercom. *(Hunt Decl., Ex. 3, p. 7.)* For example Mahalick stated in his detailed memorandum that:

> [After suggesting a change to Entercom's on-air presentation of its news updates]  But that is something I will keep to myself ... [laugh out loud]. * * * The Wolf [Entercom's station] should pull out of their 3.3 12+ shares soon, and can speed that up by making the adjustment [he discussed at length earlier in the memo] and more but will never get my thoughts." *(Answer, ¶ 6; Hunt Decl., Ex. 3, pp. 5-6, 7)*

Mahalick also identified – for Alpha but not for Entercom – his thoughts on a way that Entercom could incorporate a plan that would win the competitive battle over Alpha, but assured his Alpha

---

[3] Mahalick was served with a request for admissions and asked to admit the authenticity of various documents, including Exhibit 2 to Hunt Decl.  Mahalick's responses to plaintiff's second request for admissions establish that there are no authenticity issues *(Hunt Decl., Ex. 17).*

Page 4 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)

00169018.DOC

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

friends that he was not going to share his thoughts with his employer *(Hunt Decl., Ex. 3)*. In addition, Mahalick prepared for Alpha a comparative analysis of another Entercom station (KNRK), comparing it to a station that Alpha was about to acquire (KUFO) *(Hunt Decl., Ex. 3, pp. 10-13)*.

During his Entercom employment, Mahalick transmitted a steady stream of Entercom business information to Entercom's competitor Alpha. He admits providing Alpha with Entercom's information about the following:

- Confidential business information from upper management at Entercom. Mahalick obtained this information because he was an Entercom manager, but then routinely forwarded it to Wilson and Proffitt *(Tr. 243:1-8, 245:3-8, 251:1-5, 252:15-19)*.

- The "Quantitative Elements" of Entercom Seattle's prior broadcast agreement with the then Seattle Supersonics. This document was presumably stolen to assist Alpha in possibly structuring a similar arrangement with the Portland Trailblazers, providing an understanding of the manner in which Entercom had structured its Sonics broadcast rights agreement. This information was competitively damaging to Entercom since Entercom has a sports station in Portland in direct competition with Alpha's Portland sports station, two potential homes for the Trailblazers' future radio broadcasts. *(Hunt Decl., Ex. 4.)*. The specific quantitative elements and analysis of the Seattle Supersonics is referenced in *Hunt Decl. Ex. 4*, but is not provided as an attachment because it is highly confidential. If the Court desires, plaintiffs will file this document *(Bates No. ALPHA 000405)* under seal.

- An Entercom Department Head PowerPoint presentation. Mahalick sent this to Wilson and directed his attention to a particular slide in which "You can see how Entercom projects the shift in [new revenue types] from 1997 to 2015. Some of these revenues [sic] types did not even exist a few years ago." *(Hunt Decl., Ex. 4.)* The actual PowerPoint presentation that is referenced in the email that Mahalick disclosed is not

Page 5 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

attached to the Hunt Declaration as it is highly confidential.   If the Court wishes to review this PowerPoint presentation *(Bates No. ALPHA 000363-404)*, then plaintiffs will file this document under seal.

- A confidential presentation for a nationwide promotion with a substantial country music performer.   Every page of Entercom's document had the legend "Entercom Confidential and Proprietary."   Mahalick forwarded it Proffitt at Alpha with the instruction "For your eyes only!!!!!" *(Hunt Decl., Ex. 5.)*   If the Court requests, the document *(Bates No. RP 000059-67)* will be filed with the Court under seal.

The email records (the ones that Mahalick did not manage to destroy to cover his tracks) show that Mahalick routinely forwarded sensitive information intended for Entercom's upper management to Wilson, Proffitt, and Alpha *(Tr. 228:23-25; 246:5-10; 252:4-14, 23-25; 253:1-8; Mahalick Depo. Exs. 36, 49).*

**C.    The Alpha Parties actively encouraged Mahalick's breaches.**

The Alpha Parties were aware of Mahalick's employment with and obligations to Entercom *(Answer, ¶ 35; Tr. 80:17-25).*   But Mahalick started talking with Alpha about leaving Entercom in July of 2009 long before his Entercom contract was to end and from that time until he left Entercom, Alpha treated him as part of the team and encouraged him to work for Alpha's interests *(Hunt Decl., Exs. 3, 9-16).*

While still employed by, and handsomely compensated by, Entercom, Mahalick performed specific projects for the Alpha Parties at Wilson's request:

- In March, 2009, in response to a specific request from Wilson, Mahalick prepared a memorandum for Wilson (but not for Entercom) discussing how radio will adapt to the new digital age *(Hunt Decl., Ex. 6).*   At the time, Mahalick owed his undivided loyalty to Entercom and neither sought nor received Entercom's permission to provide industry assistance to its competitor.

Page 6 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)

00169018.DOC                              BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

- On April 27, 2009 (a work day), Wilson invited Mahalick to the San Francisco meeting regarding the possible acquisition by Wilson and investors of a radio group *(Hunt Decl., Ex. 7)*. At the time, Mahalick owed his undivided loyalty to Entercom and neither sought nor received Entercom's permission to attend such a meeting. Moreover, it is undisputed that Mahalick never reported the invitation or the content of the meeting to Entercom. Instead, Mahalick, with Wilson's knowledge, deliberately concealed his attendance from his employer Entercom. After the meeting, Mahalick thanked Wilson for inviting him to the "coolest meeting Bob [Proffitt] and I [Mahalick] were never at" (emphasis added) *(Hunt Decl., Ex. 8)*.

- On July 8, 2009 (a work day), Alpha received another round of competitive information from Mahalick, this time information about Portland stations. Mahalick included in this information about his own employer's stations, and also information about the CBS stations that Alpha would later purchase. *(Tr. 260:8-25; 261:1; Mahalick Depo. Ex. 58)* At the time, Mahalick owed his undivided loyalty to Entercom and neither sought nor received Entercom's permission to prepare information about Entercom's holdings to its competitor, nor provide assistance to Wilson, who was about to buy competitive radio stations.

- On July 10, 2009 (another Entercom work day), Mahalick provided Wilson and Proffitt a lengthy detailed strategic analysis of Portland radio stations *(Answer, ¶ 63; Hunt Decl., Ex. 3)*. Remarkably, considering that he was an Entercom employee who owed his undivided loyalty to Entercom, he sent Alpha an analysis of opportunities that would permit Entercom to compete more effectively with Alpha, but he announced that he was *not* going to share this important analysis with Entercom. *Id. at p. 7.* This was hardly an off-the-cuff piece of work. Mahalick worked over "a few days 7-7-09 to 7-8-09" to prepare the analysis, all on Entercom's time and while simultaneously ignoring his responsibilities to Entercom. *Id. at p. 2.* Mahalick owed his undivided loyalty to

Page 7 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)

00169018.DOC

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Entercom and neither sought nor received Entercom's permission to prepare a competitive analysis for a competitor about to enter the Portland market *(Hunt Decl., Ex. 3)*. As an Entercom employee he should have been providing this analysis to Entercom *(Hunt Decl., Ex. 3)*.

Mahalick made it very clear to Alpha that he was on the Alpha team *(Tr. 232:6-7, 13-14)*. In one particularly characteristic memorandum, Mahalick forwarded a confidential Entercom email to Wilson, with the snide comment about his manager's ignorance of Mahalick's doings *(Hunt Decl., Ex. 3, p. 7)*.

For their part, the Alpha Parties knew Mahalick was employed by Entercom and under a contract that contained restrictions on helping a competitor *(Tr. 80:21-22)*. On July 15, 2009, Wilson wrote to Mahalick and told him they would be announcing the "take over" of radio stations that night and inquired of Mahalick "How soon can you be here?" *(Hunt Decl., Ex. 9)*. They negotiated over his new job with Alpha and the compensation package he would receive when he left Entercom, and with that carrot in front of him, they urged him to leave his Entercom job – "get your ass out of Entercom" *(Hunt Decl., Ex. 16)* – even though he had many months left on his contractual commitment *(Hunt Decl., Exs. 9-16)*. Those negotiations were carried out over time on the clear understanding that Mahalick would not be honoring his commitment to work for Entercom until February 27, 2010 *(Hunt Decl., Exs. 9-16)*. They built up steam in the month before he quit. In his July 10, 2009 analysis of the Portland radio market, Mahalick stated that he "would like to join ALPHA" *(Hunt Decl., Ex. 3, p. 14)*. On July 23, 2009, Alpha's President, Proffitt, wrote to Wilson and stated that Mahalick "was putting some $$ thoughts on paper" and would send them to Wilson and Proffitt *(Hunt Decl., Ex. 10)*. On July 23, 2009, Mahalick wrote to Proffitt and Wilson setting forth what he claimed to be his gross earnings with Entercom in connection with his duties in San Francisco and Seattle *(Hunt Decl., Ex. 11)*. On July 25, 2009, Proffitt wrote to Wilson discussing terms of Mahalick's employment and compensation *(Hunt Decl., Ex. 12)*. On July 29, 2009 at 10:30 a.m., Proffitt wrote to Mahalick

Page 8 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

and asked him to review the "Employment Terms" which were attached to the email *(Hunt Decl., Ex. 13)*. On the afternoon of July 29, 2009, Mahalick then wrote to Proffitt asking a few questions about the Employment Terms *(Hunt Decl., Ex. 14)*. Proffitt wrote back to Mahalick on the afternoon of July 29, 2009 responding to Mahalick's questions, stating that Alpha would take care of Mahalick's lease in Seattle and that his bonus would be guaranteed for one year *(Hunt Decl., Ex. 14)*. Proffitt emailed Mahalick an Employment Term letter to which Mahalick responded "Wow....This is AWESOME." *(Hunt Decl., Ex. 15)*. Proffitt then informed Wilson that Mahalick had agreed to the deal, stating "FYI-The Sinister Minister [Mahalick referred to himself as the "Prime Minister of Twang"] is ready to go!" *(Hunt Decl., Ex. 15)*. And, of course, on July 29, 2009, Proffitt wrote to Mahalick (with a copy going to Wilson) and stated: "We can't wait to get going, so get your ass out of Entercom and into Alpha as soon as you can!" *(Hunt Decl., Ex. 16)*. In short, the Alpha Parties used Entercom's employee and the time Entercom was paying for to make recommendations for their new competing venture and egged him on with their promises and encouragement.

Shortly before he walked out on his contract at Entercom, Mahalick engaged in extraordinary double-dealing in the case of Keola Lui-Kwan, referenced above. Mahalick considered Lui-Kwan and recommended him to Alpha as someone who "is going to be a super star" *(Answer, ¶ 58)*. By contrast, Mahalick recommended to Entercom that it not renew Lui-Kwan's employment agreement purportedly due to Mahalick's concerns regarding Lui-Kwan's performance *(Answer, ¶ 57)*. Not surprisingly, Alpha has hired Lui-Kwan *(Answer, ¶ 59)*. At the time, Mahalick owed his undivided loyalty to Entercom and neither sought nor received Entercom's permission to share information about Entercom employees with a competitor nor encourage a competitor to hire an Entercom employee. Despite his responsibilities to Entercom, however, Mahalick became and remained a cheerleader for Alpha. He even admits he bantered with Wilson about doing "a little Alpha night wolf [referencing Entercom Portland's country music station, The Wolf] hunting" with Entercom's Program

Page 9 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

Director "down range" to which Wilson responded "I think it is a good idea. Wolf is dead" *(Answer, ¶ 62)*.

**D.    Alpha's use of Entercom's Registered Trademark.**

Entercom Communications Corp. and certain of its subsidiaries, including Entercom San Francisco and Entercom Seattle, previously conducted an on-the-air radio promotion entitled "Beat the Bank." Plaintiffs learned that the BEAT THE BANK mark had been federally registered by Finest City Broadcasting LLC, a limited liability corporation of San Diego, California ("FCB"), for "advertising, marketing and promotion services" and "advertising, marketing and promotions services via radio" in Class 35, Registration No. 3,272,202 ("the BEAT THE BANK mark" or "the Mark") *(Sutor Decl., ¶ 2, Ex. 1)*.

On or about September 17, 2009, FCB granted Entercom Portland an exclusive license for the Mark within the Portland, Oregon metropolitan area to utilize the Mark in connection with radio station services relating to advertising and promotion of Entercom Portland's radio stations ("the License") *(Sutor Decl., ¶ 3, Ex. 2)*.

The License also granted, with FCB's consent, the right of Entercom Portland to pursue third parties for infringement of the Mark in the Portland, Oregon metropolitan area, and to retain all damages awarded as a result of any such lawsuit *(Sutor Decl., ¶ 4, Ex. 2)*.

In the fall of 2009, Entercom Portland began to develop a "Beat the Bank" promotion to air on KWJJ in Portland and contacted a large financial institution client to serve as a potential advertiser/sponsor to participate in the promotion *(Moore Decl., ¶ 3)*.

On January 27, 2010, Alpha began conducting a Beat the Bank promotion on its country music radio station, KUPL ("Alpha Broadcasting's Beat the Bank Promotion"), which was similar to the promotions Mahalick had worked with plaintiffs to develop for use at Entercom Seattle and Entercom San Francisco *(Moore Decl., ¶ 4)*.

00169018.DOC                    BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Pursuant to the License, Entercom Portland received written consent from the Broadcasting Company of the Americas, as successor to all of the assets of FCB, to pursue Alpha for unfair competition and infringement of the Mark *(Sutor Decl., ¶ 5, Ex. 3)*.

On January 28, 2010, Entercom Communications Corp., on behalf of Entercom Portland, LLC, sent a cease and desist letter to Alpha alerting Alpha of plaintiffs' rights in the Mark and demanding that Alpha cease its unauthorized use of the Mark *(Sutor Decl., ¶ 6, Ex. 4)*. Entercom's cease and desist letter was received by Alpha *(Answer, ¶ 83)*.

Despite receiving plaintiffs' cease and desist letter, Alpha continued for a period of time to make unauthorized use of the Mark not only in its radio advertising but also in television and/or internet promotions encouraging potential radio listeners to listen to its radio broadcasts and participate in Alpha Broadcasting's Beat the Bank Promotion *(Moore Decl., ¶ 7)*.

Alpha heavily marketed its Beat the Bank promotion, utilizing television advertisements, recorded promotions and "live reads" during KUPL's radio broadcasts, a significant presence on KUPL's website, and social networking sites such as Facebook *(Moore Decl., ¶ 5)*. All of the promotions methods utilized the "Beat the Bank" Mark *(Moore Decl., ¶ 5)*.

Until approximately February 8, 2010, Alpha continued its use of the Mark in its recorded and live radio advertising and promotions to encourage potential radio listeners to listen to its radio broadcasts and participate in Alpha Broadcasting's Beat the Bank promotion *(Moore Decl., ¶ 6)*.

Until approximately February 24, 2010, Alpha continued its use of the Mark in its television advertising and promotions to encourage potential radio listeners to listen to its radio broadcasts and participate in Alpha Broadcasting's Beat the Bank promotion *(Moore Decl., ¶ 7)*.

Alpha continued until the present its use of the Mark in its internet advertising and promotions to encourage potential radio listeners to listen to its radio broadcasts and participate in Alpha Broadcasting's Beat the Bank promotion *(Moore Decl., ¶ 8)*.

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

Given Alpha's use of the Beat the Bank promotion, Entercom Portland has had to conclude that it would be ineffective and confusing to the public for Entercom Portland to run a Beat the Bank promotion at this time *(Moore Decl., ¶ 9)*.

### III. DISCUSSION

**A.    Mahalick breached his Employment Agreement with Entercom (First Claim for Relief).**

####    1.    Term of Agreement.

Mahalick breached his fixed term employment agreement when he quit Entercom with 197 days of the term left.  It is not difficult to understand why a fixed term agreement is appropriate in the radio business.  Mahalick was a Program Director for Entercom; that role is sufficiently key to operations of any radio station that a prudent station owner would want to know that it has a Program Director on staff, for how long, and whether it needs to start looking for another one.  It is undisputed that the agreement extended to February 27, 2010.  It is also undisputed that Mahalick quit without any advance notice on August 14, 2009, leaving Entercom San Francisco and Entercom Seattle in the lurch.

Mahalick's fixed term employment agreement is enforceable including under California law which permits fixed term agreements.  See Cal. Labor Code § 2920 (identifying termination of employment by expiration of fixed term), § 2922 (contrasting to at will employment), *MCA Records, Inc. v. Newton-John*, 90 Cal.App.3d 18, 23, 153 Cal.Rptr. 153, 155 (Cal.App. 1979) (enforcing fixed term agreement with singer Newton-John); *Motevalli v. Los Angeles Unified School Dist.*, 122 Cal.App.4th 97, 112, 18 Cal.Rptr.3d 562, 572 (Cal.App. 2 Dist. 2004) (discussing end of fixed term employment contract).

In his answer, Mahalick asserts that his agreement is unenforceable because some provisions (relating to a right of first refusal and post-termination conduct) arguably violate California law; however, this defense is inapplicable as a matter of law.  None of the challenged provisions has anything to do with the fixed term provisions and that is what Mahalick breached.

The provisions establishing the term of the agreement are separate and independent from the provisions Mahalick now says he dislikes, and Entercom has not sought to enforce those provisions in this litigation. Instead, this dispute is about Mahalick's quitting before the contract ended.

Mahalick is not excused from his obligations under the agreement even if some of the agreement's terms are unenforceable. See Cal Bus. and Prof. Code, § 6600 which invalidates *only* that portion of an agreement that is unlawful, leaving the remaining provisions intact ("every contract by which anyone is restrained *** is **to that extent** void") (emphasis added). Moreover, the agreement has its own severability language at ¶ 23, stating that if any provision of the Agreement should be illegal, invalid or unenforceable, "the remainder of this Agreement shall not be affected thereby."

### 2. Exclusivity.

Mahalick's employment agreement required him to work exclusively for Entercom (with certain limited exceptions not applicable here). There is nothing unusual or inappropriate about the provisions of his agreement; Mahalick committed that during the term of his Entercom employment "Employee agrees to devote Employee's best efforts and full working time to the employment by the Company hereunder and shall not directly or indirectly, either as an employee, employer, consultant, contractor, agent, or in any other individual or representative capacity, engage in or participate in or render any service to any business other than the business of the Company." Employers have the right to demand the utmost undivided loyalty during the employment term. *Stokes v. Dole Nut Co.*, 41 Cal.App.4th 285, 295-296, 48 Cal.Rptr.2d 673, 681 (Cal.App. 3 Dist. 1995); *Sequoia Vacuum Systems v. Stransk*, 229 Cal.App.2d 281, 287, 40 Cal.Rptr. 203 (1964).

It is undisputed that Mahalick engaged in conduct which breached the commitment that he would work for Entercom exclusively. While he was employed in a highly compensated management position with access to sensitive Entercom information, he informed the Alpha

Page 13 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Parties about Entercom's business, employees, and vendors, and strategized how Alpha could compete directly with Entercom's country music station in Portland, as well as Entercom generally. He was employed by Entercom, but was working to advance Alpha's interests which were directly contrary to Entercom's. That conduct included (a) preparation of a memorandum for Alpha that evaluated the competitive strength of Entercom in Portland; (b) concealing that same analysis from Entercom; (c) using his inside knowledge of certain vendors Entercom was using to suggest those same vendors to Alpha; (d) participating in a meeting on an Entercom work day to explore an Alpha potential acquisitions; (e) providing incorrect information to Entercom about Keola Lui-Kwan so that Lui-Kwan would not be continued in employment with Entercom, and then turning around and singing his praises to Alpha so that it would hire him away. See also *Fowler v. Varian Associates, Inc.*, 196 Cal.App.3d 34, 41, 241 Cal.Rptr. 539, 543 (Cal.App. 6 Dist. 1987) ("California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' 'undivided loyalty'.")

### 3.    Confidentiality.

Mahalick also agreed that he would keep Entercom business information confidential, a commitment that he violated repeatedly. His agreement recited that company information was to be the "sole and exclusive property" of Entercom and that he would safeguard it and maintain its confidentiality, not disclosing it to others without Entercom's consent. Mahalick did not abide by that contractual commitment any more than he met his obligation to work exclusively for Entercom. He did not seek nor obtain permission to tell Alpha the names of the vendors Entercom used and had plans to use in the future. He did not seek nor obtain permission to tell Alpha about Keola Lui-Kwan's superb performance and potential.

### 4.    Summary.

On the admitted and undisputed facts, plaintiffs are entitled to summary judgment as a matter of law on their claim of breach of contract. Mahalick violated three key provisions of his

Page 14 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

employment agreement - specifically, the term of the agreement, the exclusivity requirements, and the confidentiality provisions. The Court should grant this motion, leaving the issue of damages to be tried to the jury.

**B.    Mahalick breached his fiduciary duty and his duty of loyalty to plaintiffs (Second Claim for Relief) (Mahalick).**

Mahalick freely admitted that his loyalty was always with Larry Wilson *(Tr. 232:6-7, 13-14)*. His conduct, which is actionable here, demonstrates that was so. Whatever his emotional connection to Wilson and Proffitt because of past employment with them at Citadel, Mahalick was an Entercom employee, and as an Entercom employee, he was required to serve his employer's interests and not Wilson's, particularly when Wilson was moving forward in his plans to compete head-to-head with Entercom. Mahalick owed fiduciary duties and duties of loyalty to Entercom, but ignored those obligations.

Employees who violate their fiduciary duty and duty of loyalty to their employers must answer for their misconduct. That is so regardless of whether the Court applies California or Oregon law.

California recognizes a cause of action against an employee for breach of fiduciary duty (a tort under California law) and breach of the duty of loyalty. See *Mega Life and Health Ins. Co. v. Superior Court*, 172 Cal.App.4th 1522, 1529, 92 Cal.Rptr.3d 399, 405 (Cal.App. 4 Dist. 2009); *City of Hope Nat. Medical Center v. Genentech, Inc.,* 43 Cal.4th 375, 380, 181 P.3d 142, 146, 75 Cal.Rptr.3d 333, 338 (Cal. 2008). "[D]uring the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th at 295, 48 Cal. Rptr. 2d at 681 (quoting *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41, 241 Cal. Rptr. 539 (1987)); [A]n employer has the right to expect the undivided loyalty of its employees. The duty of loyalty is breached, and may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

*Stokes v. Dole Nut Co.*, 41 Cal. App. 4th at 295, 48 Cal. Rptr. 2d at 681; *Stigall v. City of Taft*, 58 Cal. 2d 565, 569-570, 25 Cal. Rptr. 441, 375 P.2d 289 (1962).

Oregon law is the same. An employee's outside activities give rise to a possibility of personal influences; *Thomas v. Bourdette*, 45 Or.App. 195, 608 P.2d 178 (1980) (an agent is under a duty not to act contrary to principal's direction absent privilege); *Horton v. Whitehill*, 121 Or.App. 336, 340, 854 P.2d 977, 980 (1993) (full time employee had duty not to usurp employer's business even if such work was done during Christmas holiday); *Miller v. Mill Creek Homes, Inc.*, 195 Or.App. 310, 315, 97 P.3d 687, 689 (Or.App. 2004) (employee owed employer duty of loyalty and was obligated to act in employer's interest).

The undisputed record establishes that Mahalick breached his fiduciary duty and duty of loyalty to Entercom by providing substantial assistance to the Alpha Parties in their competitive efforts both prior to his August 14, 2009 resignation and following August 14, 2009. The Court should enter a judgment of liability with respect to plaintiffs' Second Claim for Relief.

Although plaintiffs' claim for damages will be tried separately to the jury, the Court should order equitable relief at this time and require Mahalick to disgorge the compensation Entercom paid him for the time he was in breach of his duties, at least March 1, 2009 through August 14, 2009. An employee who breaches his fiduciary duty can be required to repay the compensation he received. See, e.g., *J.C. Peacock, Inc. v. Hasko*, 196 Cal.App.2d 353, 358, 16 Cal.Rptr. 518 (1961) (employee or agent who violates fundamental duty of loyalty cannot recover even for the services he has rendered); *Purolator Products, Inc. v. Torite Industries, Inc.*, 413 F.2d 989, 990 (9th Cir. 1969) (upholding award of damages including employees' salary from employer during period when they were secretly competing with the employer); Rest.2d Agency, § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal"). See also *Service Employees Intern. Union, Local 250 v. Colcord*, 160 Cal.App.4th 362, 371, 72

00169018.DOC    BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

Cal.Rptr.3d 763, 769 (Cal.App. 1 Dist. 2008) (summarizing) and *Paramount Mfg. Co. v. Mohan*, 196 Cal.App.2d 372, 373-374, 16 Cal.Rptr. 417, 418 (Cal.App. 1961) ("An employee is bound to the exercise of good faith toward his employer and cannot, without the latter's consent, retain profits or earnings received in the course of performance of the employer's business, or in an undertaking which constitutes a breach of duty to the employer or which conflicts with his duties to his employer.") This amount can be readily ascertained, will not be disputed, and does not require a separate trial as to liability.

It is no defense to Mahalick's conduct (or the conduct of the Alpha Parties) that Alpha or Mahalick could have assembled the same or similar information from other sources. Entercom paid for its information; Alpha used Mahalick as its own Entercom-paid mole and Mahalick just handed Entercom's property over to Alpha. It does not matter if the property is valuable information, as it is here, or paperclips. What matters is that the property belonged to Entercom and Mahalick gave it away to a competitor. Justice O'Connell's opinion in *Kamin v. Kuhnau*, 232 Or. 139, 374 P.2d 912 (1962) is to the point: "the real question is not whether the disclosee *could* have obtained the disclosed information elsewhere, but rather whether in fact he *did* so obtain it." *Id* at 149. Alpha stole Entercom's resources to avoid having to go through the time and expense to do its own analysis.

Defendants argue that the records were not sufficiently confidential to constitute protected trade secrets. The courts of Oregon have recognized that the secrecy which is protected is not absolute secrecy. It is a qualified secrecy arising from mutual understanding and required by good faith and good morals. *Kamin v. Kuhnau*, 232 Or. 139, 374 P.2d at 918 (1962).

Similarly, in *Financial Programs, Inc. v. Falcon Financial Services, Inc.*, 371 F.Supp. 770, 777 (D.Or. 1974), Judge Skopil writing for this court held that similar conduct, using confidential information supplied by an insider, constituted unfair competition:

"Defendants contend that FPI gave their representatives permission to keep the records and therefore their use is not actionable. I disagree. Even if FPI intended to give the customer lists to the salesmen, that permission was not intended, and

could not reasonably have been interpreted to allow removal of divisional files from division offices, delivery of them to a competitor, and a systematic exploitation of them in direct competition with FPI. Use is distinguishable from mere possession and may be actionable while possession is not. American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 470 F.2d 820, 825 n. 3 (9th Cir. 1972). The extent of the permitted use of the records may be implied, and the implication may be made as a legal conclusion recognizing the need for ethical practices in the commercial world. Kamin v. Kuhnau, 232 Or. 139, 374 P.2d 912, 919 (1962)."

The comments of the Ninth Circuit in *American Republic Ins. Co. v. Union Fidelity Life Ins. Co.*,

470 F.2d 820, 824 (9th Cir. 1972) are particularly appropriate here.

"Union urges that we disregard the fact that Lindgren did not wait until his resignation to commence recruiting for Union. This we decline to do. Until April 22, 1967, Lindgren was an employee of American and owed it the usual duty of loyalty. A case much like this is Bancroft-Whitney Co. v. Glen, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921 (1966) where the court said:

"'The undisputed evidence shows a consistent course of conduct by [Glen] designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful. If Glen while still president of plaintiff had performed these acts on behalf of Bender Co. [plaintiff's competitor] without also obligating himself to join the company, there could be no doubt that he would have violated his duties to plaintiff. Surely his position in this regard cannot be improved by the fact that he was also to be employed by Bender Co. . . .' 49 Cal.Rptr. at 840, 411 P.2d at 936."

The undisputed facts show that Mahalick provided Larry Wilson and the other Alpha

Parties the benefit of his time and Entercom's assets, resources, and documents to compete

against Entercom. The Court should enter judgment on liability on plaintiffs' claim for breach of

fiduciary duty and the duty of loyalty. Issues as to damages can be tried separately.

**C.     The Alpha Parties are liable for aiding and abetting Mahalick's breach of fiduciary duty (Eighth Claim for Relief).**

There can be no question that Mahalick's conduct -- assisting the Alpha Parties to

compete with Entercom while still an employee of Entercom -- was a breach of his fiduciary

duty. The Alpha Parties aided and abetted that breach of fiduciary duty.

As the Oregon Supreme Court explained, legal authorities "virtually are unanimous in

expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty

is liable to the one harmed thereby." *Granewich v. Harding*, 329 Or. 47, 56, 985 P.2d 788,

793-94 (1999) (adopting Section 876 of the *Restatement (Second) of Torts* (1979)).    The *Restatement*, as adopted in Oregon, sets out ways in which persons acting in concert may be held accountable for each other's tortious conduct -- including what happened here.    Giving substantial assistance or encouragement to another, knowing that the other person's conduct is in breach of his duty, results in liability for the resulting harm. *See also Reynolds v. Schrock*, 341 Or. 338, 345, 142 P.3d 1062, 1066 (2006).[4]

This analysis is particularly pertinent to the Alpha Parties, who aided and abetted Mahalick in his breaches.    To begin, the Alpha Parties were fully aware of Mahalick's employment with and obligations to Entercom.    Mahalick shared a copy of his Entercom employment agreement with Wilson who observed that Mahalick was bound by the Entercom agreement unless released from it. The Alpha Parties were also aware of Mahalick's breaches. While Mahalick was still working for Entercom, he began working with Wilson, Proffitt, and Jennings and discussing Wilson's potential acquisition of a radio group (Wilson, Proffitt, and Mahalick's old company) and later about Alpha's operation of the Portland radio stations it had acquired.    They discussed how best to compete in that market, including competing with Entercom's Portland radio stations. Mahalick was not doing all this on his own.    Instead, he was acting at the request of and with the substantial encouragement of the Alpha Parties.

Mahalick started talking with Alpha about leaving Entercom in the spring of 2009 long before – almost an entire year before – his Entercom contract was to end. He talked with Wilson and Proffitt to formulate strategies for Alpha's operation of radio stations that would compete

---

[4] California law is the same; it has also adopted the common law rule that a person who aids and abets a tort is liable for the harm thereby caused.  The California rule is simply stated: "liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th 1138, 1144, 26 Cal.Rptr.3d 401, 405 (Cal.App. 4 Dist. 2005).

Page 19 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

with Entercom and its operating subsidiaries. Mahalick was on Entercom's payroll at the time, and the Alpha Parties knew it. As early as March, 2009 -- while Entercom was paying Mahalick's substantial salary -- Wilson was assigning projects to Mahalick including preparing a strategic analysis about adapting to the digital age in radio, attending a business meeting regarding Wilson's possible acquisition of a radio group, collecting ratings numbers in the Portland market, and preparing a detailed analysis of Portland stations for Wilson. They also started talking about how to recruit staff for the new Alpha venture, and made use of Mahalick's identification of certain key players within Entercom and vendors who had proved to be valuable resources that the Alpha Parties should consider contacting. In short, the Alpha Parties used Entercom's employee (Mahalick) and the time Entercom was paying for to make recommendations for their new competing venture.

The rule which imposes liability for aiding and abetting a breach of fiduciary duty is sensibly applied here. Mahalick -- with the consent and encouragement of the Alpha Parties -- was surreptitiously working for Alpha but taking a paycheck from Entercom.

**D.    The Alpha Parties intentionally interfered with Entercom's contract and prospective economic relations with Mahalick (Fifth Claim for Relief: Count One).**

The same admitted and undisputed conduct establishes tortious interference by the Alpha Parties with Entercom's contract with Mahalick and Entercom's prospective economic relationship with him.

The Alpha Parties were aware of Mahalick's Agreement. Mahalick gave Wilson a copy when he was trying to figure out how to avoid his responsibilities. Wilson read it and expressed his opinion that Mahalick was not going to be able to leave Entercom early unless Entercom agreed. Wilson, and by extension Alpha (since he is the owner and employee / agent for Alpha), knew that Mahalick was bound to a fixed term employment agreement. Nevertheless, the Alpha Parties encouraged Mahalick to leave before the contract ended.

00169018.DOC                                         BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Under Oregon law, a party can recover on a claim for intentional interference with economic relations (or contract) provided it can show: (1) the existence of a contract (or prospective economic advantage); (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *Wieber v. FedEx Ground Package System, Inc.*, 231 Or. App. 469, 477, 220 P.3d 68, 75-6 (2009) *citing McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

Here, admitted and undisputed evidence shows that Alpha was negotiating employment terms with Mahalick in July, 2009 (seven months before Mahalick's Entercom contract would end), all on the assumption that Mahalick could be encouraged to leave Entercom early *(Hunt Decl., Ex. 3, p. 14; Hunt Decl., Exs. 9-16)*. Proffitt told Wilson -- in July 2009 -- that Mahalick was "ready to go" and, on July 29, 2009, Proffitt wrote to Mahalick (copying Wilson) telling him that "we can't wait to get going" and instructing him to "get your ass out of Entercom and into Alpha as soon as you can!" *(Hunt Decl., Ex. 16)*. Mahalick left Entercom with 197 days left on his contract and the Alpha Parties accepted him with open arms.

The tort of interference with economic relations "'serves as a means of protecting contracting parties against interference in their contracts from *outside* parties.'" *Wieber*, 231 Or. App. at 479 *quoting McGanty,* 321 Or. at 536, 901 P.2d 841 (emphasis in original). The tort, therefore, allows a party to a contract that is breached by the other contracting party to seek damages from a third party that induced the other contracting party to breach that contract. *Wieber*, 231 Or. App. at 479.[5]

---

[5] Similarly, under California law, when a contract exists and a stranger to the contractual relationship knows of the contract and acts to induce a breach or disruption of the contract, he is liable for the resulting damage—even if the stranger's actions are not wrongful apart from the interference itself; intentionally inducing or causing a breach of an existing contract is a wrong in and of itself. *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55, 960 P.2d 513, 530-531, 77 Cal.Rptr.2d 709, 726-727 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990).

00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

A third party also can be held responsible for interference simply by a showing of injury to the contractual relationship. *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or. App. 371, 381, 879 P2d 1288 (1994) *citing Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 621, 733 P2d 430 (1987). This injury requirement can be met by showing that the interfering entity caused a breach of the contract or by showing that the interfering entity rendered the "plaintiff's obligations more onerous or prevented [the] plaintiff from realizing the full benefit of his contract." *Banaitis*, 129 Or. App. at 381.[6] A third party can be held responsible for interference even though an enforceable contract did not exist. *See, e.g.*, *Wieber*, 231 Or. App. at 479.[7] The interference tort protects the relationship.

The Court should enter judgment in favor of Entercom on liability on plaintiffs' interference claim.

---

[6] California caselaw also protects contracts from interference in circumstances where the interference is simply inducing another to terminate an agreement in accordance with its terms. *Pacific Gas & Electric Co. v. Bear Stearns & Co., supra.* Damages are recoverable even if the interference simply makes enjoyment of the contract more expensive or burdensome—similar to Oregon's standard allowing damages where the interference "prevented [the] plaintiff from realizing the full benefit of his contract." *Id.; Banaitis*, 129 Or. App. at 381.

[7] Stated more succinctly in a California case: despite an unenforceable contract liability can still attach for interference. *Buckaloo v. Johnson,* 14 Cal.3d 815, 826, 122 Cal.Rptr. 745, 537 P.2d 865 (1975) (since people "'usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say that the contract ... meddled with could not have been enforced....'"). Additionally, as in Oregon, a claim for intentional interference also exists where there is no enforceable contract, but rather prospective business or economic relations: in California, liability arises when there is (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff (even where no contract is present); (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo*, 43 Cal.3d 64, 71, fn. 6, 233 Cal.Rptr. 294, 729 P.2d 728 (1987); *Pacific Gas & Electric Co. v. Bear Stearns & Co., supra; see also Wieber*, 231 Or. App. at 477. The Alpha Parties and Mahalick are also liable for intentional interference with prospective economic relations.

00169018.DOC        BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

E.  **Plaintiffs are entitled to partial summary judgment against Alpha for federal trademark infringement (Ninth Claim for Relief).**

Under the Lanham Act, a plaintiff can assert claims for service mark infringement of registered marks under 15 U.S.C. § 1114 and for unfair competition of unregistered, i.e., common law, marks under 15 U.S.C. § 1125.[8] The same test applies for proving service mark infringement and unfair competition, which is "whether the public is likely to be deceived or confused by the similarity of the marks." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (citations omitted) (affirming summary judgment of federal trademark infringement and unfair competition).

Accordingly, to prevail under either provision, a plaintiff must prove that: (1) they are the owner of a valid, protectable mark; and (2) the alleged infringer used the plaintiff's mark "in commerce" in a manner "likely to cause confusion, or to cause mistake, or to deceive" as to the source of the infringing product or service. See 15 U.S.C. §§ 1114(1), 1125(a); see also *Dennison v. Angier*, Civil No. 07-6360-AA, 2008 WL 2166525, at *2 (D.Or. May 20, 2008) (granting summary judgment of federal trademark infringement).

In the Ninth Circuit, the *Sleekcraft* factors are assessed to determine if there is a likelihood of confusion, which are: (1) the similarity of the marks; (2) the relatedness of the parties' goods or services; (3) the similarity of trade or marketing channels; (4) defendant's intent; (5) the strength of the plaintiff's marks; (6) evidence of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the likelihood of expansion into other markets. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003). The Ninth Circuit noted, "[w]hen the goods [or services] produced by the alleged infringer compete for

---

[8] The Amended Complaint refers to the Ninth Count for Relief as "Federal Trademark Infringement," but this may also be referred to as "service mark infringement" where, as here, the mark is used in connection with the performance of services.

00169018.DOC    BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR  97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected." Id. at 348.

Not all the *Sleekcraft* factors are weighed equally. Where, as here, the marks and goods/services are identical or nearly so, the Ninth Circuit and Oregon courts have found summary judgment appropriate. See *Century 21 Real Estate Corp.*, 846 F.2d 1175 (affirming summary judgment); *Dennison*, 2008 WL 2166525 (granting summary judgment); *Florists' Transworld Delivery, Inc. v. Clarence Walker For Flowers Inc.*, No. 03-807-KI, 2008 WL 1875788, at *2 (D.Or. Aug. 5, 2005) (granting summary judgment of trademark infringement, without evidence of actual confusion, where "the marks are the same, the two companies' products are the same, the marketing channels are the same, and even a customer exercising great care would be confused.").

For example, in *Dennison*, plaintiffs sold over the internet dietary supplements under the registered mark STA-NATURAL. Defendants later began selling competing dietary supplements online at Sta-Natural.com. The court granted summary judgment against defendants, reasoning as follows:

> [I]t is undisputed that plaintiffs' trademark Sta-Natural is a U.S. registered trademark. Plaintiffs' mark is therefore prima facie valid. It is similarly undisputed that defendants are using the identical trademark to Sta-Natural to sell competing goods to the general public. Therefore, as a matter of law, defendants are infringing plaintiffs' registered trademark Sta-Natural.

*Dennison v. Angier*, 2008 WL 2166525, at *3.

Here, the undisputed facts discussed below support that plaintiffs are entitled to summary judgment against defendant Alpha on the claims for federal service mark infringement and unfair competition. Plaintiffs own a valid, protectable interest in the registered Mark, Beat the Bank, and the use of it by the Alpha Parties created a likelihood of confusion.

Under the Lanham Act, a certification of registration for a mark is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce on or

00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b). Here, plaintiffs' BEAT THE BANK mark is registered as U.S. Service Mark Registration No. 3,272,202 for "advertising, marketing and promotion services; [and] advertising, marketing and promotion services via radio" ("The 202 Registration"). *(Sutor Decl., Ex. 1)*. The Registration was filed May 23, 2006 and indicates a first use date of May 13, 2006. *[Id.]*. Although Finest City Broadcasting LLC of California ("Finest") is the owner of the 202 Registration, Finest granted plaintiffs an exclusive license to use and enforce the mark within the Portland, Oregon metropolitan area. *(First Amended Complaint, at ¶¶ 78-79, 82.) (Sutor Decl., Ex. 2.)* That exclusive license coupled with the 202 Registration, which is prima facie evidence of validity and enforceability, allow plaintiffs to enforce the registered mark against Alpha under 15 U.S.C. § 1114(1).

Each *Sleekcraft* factor weighs in favor of plaintiffs, meaning there is no dispute that a likelihood of confusion exists as to whether consumers believe that plaintiffs are the source or sponsor of the services of Alpha. Therefore, summary judgment is appropriate.

### 1. Similarity of the Marks.

Alpha is using the identical mark – BEAT THE BANK - as that of plaintiffs. *(Amended Complaint, at ¶¶ 72-75, 81, Ex. 5.)* This factor favors plaintiffs.

### 2. Relatedness or proximity of the parties' services.

Plaintiffs and Alpha are competitors that own country music radio stations directly competing in the Portland, Oregon metropolitan area, and plaintiffs also own other West Coast country music stations. *(Id., at ¶¶ 4-7, 10-11, 71, 81.)* Both parties use the mark BEAT THE BANK in association with an on-the-air radio promotion for their respective country music stations. *(Id., at ¶¶ 72-75, 80-81, 84.)* The services identified in the 202 Registration are "advertising, marketing and promotion services; [and] advertising, marketing and promotion services via radio." *(Id., Ex. 5.)* The services are therefore identical, so this factor favors plaintiffs.

00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

### 3.   Similarity of trade or marketing channels.

Both companies use the mark BEAT THE BANK in association with radio promotions for their respective country music stations. *(Id.)* Because the parties are direct competitors operating in the same marketing channels, this factor favors plaintiffs.

### 4.   Defendants' intent.

Under Ninth Circuit precedent, "[t]he law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark..., its intent may be sufficient to justify the inference that there are confusing similarities." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (citations and formatting omitted); see *Dennison*, 2008 WL 2166525 (granting summary judgment where defendants knew of plaintiffs' mark before initiating sales). Here, defendant Mahalick, while working for plaintiffs, participated in the BEAT THE BANK radio promotions that plaintiffs began offering in 2006, and therefore knew about plaintiffs' rights in the BEAT THE BANK mark for radio promotions. *(Amended Complaint, at ¶¶ 73-74.)* As such, when Alpha began using plaintiffs' BEAT THE BANK mark for a radio promotion after Mahalick joined Alpha, it did so knowing of plaintiffs' rights. *(Id., at ¶¶ 71, 81, 84.)* Accordingly, this factor favors plaintiffs, who are also entitled to a presumption under Ninth Circuit precedent that the public will be confused by Alpha's use of the BEAT THE BANK mark.

### 5.   Strength of Mark.

Plaintiff's mark BEAT THE BANK is entitled to strong protection in that it is at least suggestive when used in association with radio promotions. Moreover, before Alpha usurped its use, plaintiffs' mark already achieved a high level of recognition for radio promotions through plaintiffs' advertising and media exposure. *(See id., at ¶¶ 72, 73, 75, 80.)* Accordingly, this factor favors plaintiffs.

Page 26 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

6.    **Actual confusion.**

Actual confusion is not necessary for a finding of likelihood of confusion. *Century 21*, 846 F.2d at 1178. "The failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1050. For example, the court in *Florists' Transworld Delivery, Inc.* still found summary judgment appropriate even without evidence of actual confusion due to the identicalness of the parties' marks and goods. 2005 WL 1875788, at *2. This factor becomes even less dispositive when the infringer is only briefly using the mark. See *Wrenn v. Boy Scouts of Am.*, No. C 03-04057 JSW, 2008 WL 4792683, at *7 (N.D. Cal. Oct. 28, 2008) (granting summary judgment of infringement and holding that actual confusion evidence "does not factor into the calculus" where infringer was in its "infancy" and made only "brief" use of mark).

Similar to *Florists'* and *Wrenn*, the parties here are using identical marks and services, and Alpha's use of plaintiffs' mark was brief. Accordingly, evidence of actual confusion is unnecessary here to support summary judgment.

7.    **Degree of care exercised by the average purchaser.**

"Likelihood of confusion is determined on the basis of a reasonably prudent consumer. What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1060 (citations omitted). Given that the marks and services of the parties are identical, the average radio listener could not discern what source was sponsoring the BEAT THE BANK promotion. Therefore, with such a high probability of confusion as to the source, this factor favors plaintiffs.

8.    **Likelihood of expansion into other markets.**

A trademark owner may receive greater protection against competing goods or services where there is a "strong possibility that either party may expand his business to compete with the

Page 27 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (ON LIABILITY)
00169018.DOC
BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

other." *Sleekcraft*, 599 F.2d at 354 (quotations omitted). Here, this factor is inapplicable because the parties already directly compete.

Overall, because every relevant factor favors plaintiff, summary judgment of federal trademark infringement must be granted.

**F.    Plaintiffs are entitled to partial summary judgment on plaintiffs' claim of federal unfair competition (Tenth Claim for Relief).**

**1.    Plaintiffs own a valid, protectable interest in the Mark BEAT THE BANK under common law (Tenth Claim for Relief).**

Plaintiffs began using the BEAT THE BANK mark for radio promotions at their stations at least as early as 2006 in San Francisco and Seattle. *(First Amended Complaint, at ¶¶ 72-73.)* Defendant Mahalick even participated in these promotions on behalf of plaintiffs in Seattle in 2007 and 2008 and San Francisco in 2008. *(Id., at ¶ 73.)* During 2009, plaintiffs were actively taking steps to conduct a similar BEAT THE BANK promotion for the radio station that plaintiffs' owned in Portland. *(Id., at ¶¶ 75-80.)* Therefore, Alpha first used the mark BEAT THE BANK after plaintiffs first used that mark. *(Id., at ¶¶ 81, 83-84.)* Accordingly, plaintiffs own common law rights in the BEAT THE BANK MARK enforceable against Alpha under 15 U.S.C. § 1125(a).

**2.    There is a likelihood of confusion as a matter of law.**

As stated above, the likelihood of confusion analysis for federal unfair competition is the same as that for federal trademark infringement. See also *Symantec Corp. v. CD Micro, Inc.*, 286 F. Supp. 2d 1265, at 1275 (D.Or. 2003) (stating "[b]ased on the analysis for the trademark infringement claim, I grant summary judgment of liability on the unfair competition claim"). Accordingly, for the reasons given that support the service mark infringement claim, a likelihood of confusion exists for purposes of the unfair competition claim. Summary judgment is therefore appropriate.

00169018.DOC    BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212

For the foregoing reasons, summary judgment is appropriate on plaintiffs' claims for federal trademark infringement based on the 202 Registration and for unfair competition based on plaintiffs' common law rights in the mark BEAT THE BANK.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant plaintiffs' motion for partial summary judgment.

DATED this 19th day of March, 2010.

BARRAN LIEBMAN LLP

*s/Richard C. Hunt*

By _____

    Richard C. Hunt, OSB No. 68077
    Paula A. Barran, OSB No. 80397
    Edwin A. Harnden, OSB No. 72112
    Telephone: (503) 228-0500
Attorneys for Plaintiffs Entercom Communications Corp., Entercom San Francisco, LLC; Entercom Seattle, LLC; and Entercom Portland, LLC

Page 29 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)

00169018.DOC                      BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of March, 2010, I served the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ON LIABILITY)**on the following parties:

Jon P. Stride
Tonkon Torp LLP
888 S.W. Fifth, Suite 1600
Portland, Oregon 97204-2099

Michael E. Caples
Fitzgerald Abbott & Beardsley LLP
1221 Broadway
21st Floor
Oakland, CA 94612

Mark A. Friel
Keith Ketterling
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak St., Suite 500
Portland, OR 97204

by causing the same to be:   ☑ emailed   ☐ mailed   ☐ hand delivered   ☐ faxed

to them a true and correct copy thereof.

*s/Richard C. Hunt*

_____
Richard C. Hunt
Of Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500   FAX (503) 274-1212