**Jon P. Stride**, OSB No. 903887
  E-mail:  jon.stride@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204-2099
  Stride Direct Dial:  503.802.2034
  Stride Direct Fax:  503.972.3734

**Joel McCabe Smith**, CSB No. 50973 (*Pro Hac Vice* Pending)
  E-mail:  jsmith@lpsla.com
**LEOPOLD PETRICH & SMITH**
2049 Century Park E Suite 3110
Los Angeles, CA 90067-3274
  Telephone:  310.277.3333
  Fax:  310.277.7444

        Attorneys for Defendants Alpha Broadcasting, LLC,
        Larry Wilson, and Robert Proffitt

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ENTERCOM COMMUNICATIONS CORP.**; **ENTERCOM SAN FRANCISCO, LLC**; **ENTERCOM SEATTLE, LLC**; and **ENTERCOM PORTLAND, LLC,** | Civil No. 3:09-cv-1050-HA |
| Plaintiffs, | **ALPHA BROADCASTING, LLC, LARRY WILSON AND ROBERT PROFFITT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | **ORAL ARGUMENT REQUESTED** |
| **SCOTT MAHALICK**; **LARRY WILSON**; **ROBERT PROFFITT**; and **ALPHA BROADCASTING, LLC** | |
| Defendants. | |

# TABLE OF CONTENTS

I.    BACKGROUND FACTS ........................................................................1

     A.    Defendants Wilson, Proffitt and Mahalick's Relationship ...........................1

     B.    Wilson's Re-entry Into the Radio Broadcasting Industry ............................2

     C.    Other Information Mahalick Shared with Wilson ......................................4

     D.    Wilson Wanted to Work With His Old Citadel Team at Alpha Broadcasting ..........6

     E.    Alpha's Use of the Slogan "Beat the Bank" ...........................................7

II.   SUMMARY JUDGMENT STANDARD.............................................................9

III.  LEGAL ARGUMENT.............................................................................10

     A.    Choice of Law for Aiding and Abetting and Tortious Interference Claims. ...........10

     B.    The Alpha Defendants did not Aid and Abet Defendant Mahalick's Alleged
           Breach of Fiduciary Duty..................................................................11
           1.    Summary judgment is improper on Plaintiffs' breach of fiduciary
                 duty claim against Mahalick........................................................11
           2.    None of the Alpha Defendants aided and abetted Mahalick's breach
                 of his fiduciary duty.................................................................16

     C.    The Alpha Defendants Did Not Tortiously Interfere with Defendant
           Mahalick's Employment Agreement........................................................19
           1.    The Alpha Defendants did not intend to interfere with
                 Mahalick's contract. ................................................................20
           2.    The Alpha Defendants did not act with an improper means or
                 improper motive.....................................................................20
           3.    Mahalick's Employment Agreement is not enforceable. ....................22

     D.    Plaintiffs' Motions for Summary Judgment on their Trademark Infringement
           and Unfair Competition Claims should be dismissed.....................................22
           1.    Basis of the claims ..................................................................22
           2.    Disputed Issues of material fact preclude a judgment of liability on .................
                 Plaintiffs' federal trademark claim...............................................24
           3.    Plaintiffs have neither used the "mark" nor shown a present intent and
                 concrete plans to use the mark in Portland. ...................................28
           4.    Plaintiffs have presented no evidence of "confusion." ......................30

     E.    Disputed Issues of Material Fact Preclude A Judgment of Liability on
           Plaintiffs' Federal Unfair Competition Claim............................................31
           1.    Plaintiffs do not own an exclusive "common law right" to the use of
                 the phrase "Beat The Bank" in Portland. ......................................31
           2.    Plaintiffs alleged common-law mark is not protectable. .....................32
           3.    There is no "likelihood of confusion as a matter of law" ...................32

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Acrymed, Inc. v. Convatec,*
    317 F. Supp. 1204 (D. Or. 2004) .....................................................................12, 21

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970)................................................................................................10

*Alternative Legal Services, Inc. v. Ferman Management Services, Inc., et al,*
    2008 WL 65584 (D. Or. 2008).........................................................................12, 21

*American Republic Ins. Co. v. Union Fidelity Life Ins. Co.,*
    470 F.2d 820 (9th Cir. 1972) ................................................................................14

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................9

*Auto Channel, Inc. v. Speedvision Network. LLC,*
    144 F.Supp.2d 968 (ND Ill. 2001) ........................................................................12

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,*
    *174 F.3d 1036, 1046 (*9th Cir. *1999)* ....................................................................25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..................................................................................................9

*Commodity Futures Trading Commission v. W. Savage,*
    611 F. 2d 270 (9th Cir. 1980) ................................................................................19

*Consultants, Inc. v. Johnson,*
    835 F.Supp. 554 (1993) ...................................................................................13, 14

*Dawn Donut C. v. Hart's Food Stores, Inc.,*
    267 F. 2d 358 (2nd Cir. 1959).............................................22, 28, 29, 30, 33

*Diamond v. Atwood,*
    43 F.3d 1538 (D.C. Cir. 1995)................................................................................9

*Emergency One, Inc. v. American Fire Eagle Engine Co., Inc.,*
    332 F. 3d 264 (4th Cir. 2003) ................................................................................31

*Entrepreneur Media, Inc. v. Smith,*
    279 F.3d 1135 (9th Cir. 2002). ...........................................................24, 25, 26, 27

*Fields v. Legacy Health Systems,*
    413 F.3d 943 (9th Cir. 2005) ............................................................................10

*KendallJackson Winery, Ltd. v. E. & J. Gallo Winery,*
    150 F.3d 1042 (9th Cir. 1998) ..........................................................................27

*KP Permanent Make-Up v. Lasting Impression I, Inc.,*
    --- U.S. ---, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004) .......................................30

*KP Permanent MakeUp, Inc. v. Lasting Impression I, Inc.,*
    408 F.3d 596 (9th Cir. 2005) ......................................................................24, 25

*Lahoti v. Veri Check, Inc.,*
    586 F.3d 1190 (9th Cir. 2009) ....................................................................26, 27

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,*
    192 F.3d 337 (2d Cir. 1999)..............................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)............................................................................................9

*Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*
    41 F.3d 1242 (8th Cir. 1994) ......................................................................29, 31

*Neilson v. Union Bank of California, N.A.,*
    290 F.Supp.2d 1101 (CD Cal. 2003) .................................................................17

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,*
    469 U.S. 189 (1985)...........................................................................................27

*Quicksilver, Inc. v. Kymsta Corp.,*
    466 F.3d 749 (9th Cir. 2006) .............................................................................25

*Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.,*
    750 F.2d 1295 (5th Cir. 1985) ...........................................................................28

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
    59 F.3d 902 (9th Cir. 1995) ...............................................................................26

*Surfvivor Media, Inc. v. Survivor Productions,*
    406 F.3d 625 (9th Cir. 2005) .............................................................................30

*Thomas & Betts Corp. v. Panduit Corp.,*
    108 F.Supp.2d (ND Ill. 2000). ...........................................................................12

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
    505 U.S. 763 (1992)......................................................................................25, 26

*Union Nat'l Bank of Tex., Austin, Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex*,
909 F.2d 839 (5th Cir. 1990) .............................................................................................27

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
419 F.3d 925 (9th Cir. 2005) .............................................................................................25

*Zobmondo Entertainment, LLC v. Falls Media, LLC, et al.*,
602 F.3d 1108 (9th Cir. 2010) ...........................................................................24, 25, 26, 28

**UNPUBLISHED FEDERAL CASES**

*Alternative Legal Services, Inc. v. Ferman Management Services, Inc., et al*,
2008 WL 65584 (D. Or. 2008)......................................................................................12, 21

*Swartz v. Deutsche Bank*,
2008 WL 1968948 (W.D. Wa. 2008) ................................................................................17

**STATE CASES**

*Casey v. U.S. Bank National Assoc.*,
127 Cal.App.4th 1138 (2005) .............................................................................................17

*Citing Stokes v. Dole Nut Co.*,
41 Cal.App.4th 285 (1995) .................................................................................................13

*Cropp v. Interstate Distributor Co.*,
129 Or. App. 510, 880 P.2d 464 (1994)..............................................................................10

*DeFoor v. Lamatta*,
249 Or. 116, 437 P.2d 107 (1968) ......................................................................................10

*Gerard v. Ross*,
204 Cal.App.3d 968 (1988) ................................................................................................17

*Granewich v. Harding*,
329 Or. 47 (1999)................................................................................................................17

*Howard v. Superior Court*,
2 Cal.App.4th 745 (1992) ...................................................................................................17

*Huong Que, Inc. v. Luu*,
150 Cal.App.4th 400 (2007) ...............................................................................................13

*KC Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*
171 Cal.App.4th 939 (2009) ...............................................................................................18

*Kieburtz & Associates, Inc. v. Rehn,*
    68 Wash. App. 260 (1992) ...................................................................13

*Kopka, Landau & Pinkus v. Hansen,*
    874 N.E. 2d 1065 (2007) ..................................................................14

*Lattue v. Keystone Inv. Co.,*
    6 Wash. App. 765 (1972) ...................................................................17

*Lomita Land Water Co. v. Robinson,*
    154 Cal. 36, 97 (1908) .......................................................................17

*M+W Zander, U.S. Operations, Inc. v. Scott Co. of California,*
    190 Or. App. 268 (2003) ...................................................................11

*McGant v. Staudenraus,*
    321 Or. 532, 901, P.2d 841 (1995) ...................................................21

*Mortgage Specialists, Inc. v. Davey,*
    153 NH 764, 776, A.2d 652 (2006) ..................................................12

*Pleas v. Seattle,*
    112 Wash.2d 794, 774 P.2d 1158 (1998) .........................................21

*Ramona Manor Convalescent Hosp. v. Care Enterprises,*
    177 Cal.App.3d 1120 (1986) .......................................................12, 21

*Reynolds v. Schrock,*
    197 Or. App. 564 (2005) ...................................................................17

*Straube v. Larson,*
    287 Or. 357, 600 P.2d 371 (1979) ...................................................21

*Thola v. Henschell,*
    140 Wash.App. 70 (2007) ...........................................................12, 21

**FEDERAL STATUTES**

15 U.S.C. § 1052(f) ........................................................................................26

**STATE STATUTES**

Cal. Civ. Code § 3426.7 ................................................................................12

ORS 646.475(1) .................................................................................................12

R.C.W. 19.108.900. ..........................................................................................12


**RULES**

Fed. R. Civ. P. 56(b) ...........................................................................................9


**OTHER AUTHORITIES**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
(4th ed. 2010) ..............................................................................24, 27, 28, 31, 32

Restatement (Second) of Agency ......................................................................13

Restatement (Second) of Agency § 393 ............................................................13

Restatement (Second) of Agency § 393, comment (e) ......................................14

Restatement (Second) of Torts ..........................................................................17

Restatement (Third) of Agency §§ 8.04, comment c .........................................14

Defendants, Alpha Broadcasting, LLC, Larry Wilson and Robert Proffitt (together, the "Alpha Defendants") submit this Memorandum in Opposition to Plaintiffs' Motion Partial for Summary Judgment.

Plaintiffs have moved for summary judgment on three claims against the Alpha Defendants:  (1) Aiding and Abetting Defendant Mahalick's Breach of Fiduciary Duty; (2) Tortious Interference with Defendant Mahalick's Employment Contract with Plaintiffs Entercom San Francisco LLC and Entercom Seattle LLC; and, (3) Trademark Infringement by using the mark BEAT THE BANK.  Plaintiffs make no attempt to distinguish among the Alpha Defendants or to specifically identify the alleged illegal actions of each one.  Instead, Plaintiffs simply assert that all engaged in conduct that satisfies the elements of these claims as a matter of law.  As the Alpha Defendants demonstrate below, the material facts related to the elements of each of these claims are at least disputed; in some cases, Plaintiffs have not submitted any facts to support these claims.  Accordingly, summary judgment is improper on each of Plaintiffs' claims.

## I.      BACKGROUND FACTS

### A.      Defendants Wilson, Proffitt and Mahalick's Relationship

Larry Wilson, Robert (Bob) Proffitt and Scott Mahalick developed a close friendship during their work for Citadel Broadcasting Company ("Citadel").  Wilson began working for Citadel as its General Counsel and eventually became its Chief Executive Officer.  Over a period of 17 years, Wilson built Citadel into a broadcasting powerhouse, with over 205 radio stations nationwide.  (Larry Wilson Declaration ("Wilson Decl."), ¶ 2, filed herewith.) Proffitt became Citadel's Chief Operating Officer and held that position for 16 years. (Robert Proffitt Declaration ("Proffitt Decl."), ¶ 2, filed herewith.)  Mahalick started with Citadel in 1992 and eventually became its National Program Director.  (Scott Mahalick Declaration ("Mahalick Decl."), ¶ 1, filed herewith.)

Wilson left Citadel in 2001 when he sold his interest in the company.  (Wilson Decl., ¶ 2.)  Proffitt stayed on until 2003.  After leaving, Proffitt became the manager of the CBS stations in Las Vegas, the position that he held before joining defendant Alpha Broadcasting LLC ("Alpha").  (Proffitt Decl., ¶¶ 2-3.)  Mahalick stayed with Citadel until 2002  (Mahalick Decl., ¶ 1.)

On October 19, 2005, Mahalick became the Program Director for Entercom Seattle LLC's country station.  Entercom San Francisco LLC acquired radio stations in San Francisco in 2007 and asked Mahalick to move to San Francisco to serve as the Program Director for one of the stations.[1]  (Mahalick Decl., ¶ 3.)  Approximately two months after taking that position, Entercom SF presented him with an employment agreement, which it required him to sign.  (Mahalick Decl., ¶ 4 and Ex. 1).

### B.     Wilson's Re-entry Into the Radio Broadcasting Industry

In the Spring of 2009, Wilson became interested in the changes to the radio industry since he had been away from it.  He began reading industry publications, including information on digital radio – that is, radio broadcast over the internet as opposed to radio towers.  (Wilson Decl., ¶ 3.)  Wilson had continuously corresponded with and visited with his close friend, Mahalick, since leaving Citadel.  They often discussed the radio industry generally since that was their mutual background.  (*Id.*, ¶ 2.)  During these discussions, in an e-mail dated March 27, 2009, Wilson asked Mahalick about digital radio.  Mahalick responded the next day with his general impressions of the industry and attached a number of public links to websites that he believed would provide Wilson with a broad perspective on the subject.  (Mahalick Decl., ¶ 18 and Ex. 9.)  At the time Mahalick provided his thoughts on digital radio to Wilson, Wilson

---

[1] Entercom Seattle LLC ("Entercom Seattle"), Entercom San Francisco LLC ("Entercom SF") and Entercom Portland LLC ("Entercom Portland") are separate legal entities.  (See Plaintiffs' Corporate Disclosure Statements.)  Entercom Communications Corporation is the managing member of each of these separate companies.  Plaintiffs' Corporate Disclosure Statement.  Mahalick's employers were Entercom SF and Entercom Seattle only.  (Mahalick Decl., ¶ 16 and Ex. 1 )

had not even formed a company to acquire radio stations or identified specific stations that he might be interested in acquiring. (Wilson Decl., ¶ 3.)

By April 2009, Wilson had communicated with Endeavour Capital, a Portland, Oregon venture capital firm that had been a major investor in Citadel, about joining him in another investment in the radio broadcasting industry. Wilson coordinated a meeting with Endeavour principles and other investors to consider acquiring either Citadel Broadcasting Company or Susquehanna Broadcasting Company. (Wilson Decl., ¶¶ 4-5) Wilson invited Mahalick to this April 27, 2009 meeting to describe the role of digital radio in the radio broadcasting industry. (*Id.*, ¶ 5.) Mahalick took a vacation day from his job at Entercom SF to attend, but due to time constraints, only presented for a couple of minutes on the topic. Mahalick did not discuss Entercom SF or Entercom Seattle at that meeting or with Wilson prior to the meeting. (Mahalick Decl., ¶ 19.)

Although Wilson and Endeavour Capital decided not to pursue either Citadel Broadcasting or Susquehanna Broadcasting, they did identify an opportunity to acquire Paul Allen's Rose City stations and the CBS stations in Portland. (Wilson Decl., ¶ 6.) On August 7, 2009 they entered into a letter of intent and a Local Marketing Agreement to operate the Rose City stations and an Asset Purchase Agreement for the CBS stations. (*Id.*) One of the CBS stations was KUPL, a country station. (*Id.*) Knowing Mahalick's years of experience in radio programming and based on his long relationship with Mahalick, Wilson asked Mahalick to listen to the Portland stations and to tell him what he thought. (Wilson Decl., ¶ 7.) Mahalick recorded the programming for various Portland stations, including KUPL and Entercom Portland's KWJJ, and listened to them in the evenings. He then wrote down his observations in an e-mail that he sent to Wilson and Proffitt on July 10, 2009 with a short follow-up e-mail on July 11, 2009. (Mahalick Decl., ¶ 20, and Ex. 5.) Mahalick's observations were based entirely on listening to the radio broadcasts and did not use or disclose any confidential information from Entercom SF or Entercom Seattle. (Mahalick Decl., ¶ 20.) Alpha engaged consultants to listen to and analyze

the Portland radio market and provide market research on which it based its programming

decisions during Alpha's initial operation of the Portland radio stations.  (Proffitt Depo., 195:13-

20 and 246:18-247:14.)

      Mahalick's digital radio overview (Mahalick Decl., Ex. 4.) and his observations

on Portland radio broadcasts (*Id*., Ex. 5.) were the only communications that Wilson ever

requested from Mahalick related to the radio industry.  (Wilson Decl., ¶ 7; Mahalick Decl., ¶ 22.)

### C.    Other Information Mahalick Shared with Wilson

      Mahalick sent other information to Wilson and one email to Proffitt that he

thought would demonstrate trends in the industry or identify his accomplishments.  (Mahalick

Decl., ¶ 32.)  The one Entercom SF document that Mahalick sent to Proffitt was a promotion

script for a "Sing Like Taylor Swift" promotion.  Proffitt did not request the document and did

not review it when he received it.  (Proffitt Decl. ¶ 12.)[2]

      When Wilson received information from Mahalick, the emails were among

hundred of emails that Wilson received.  He often did not open the attachments.  Those

attachments that he did open did not have confidential stamped on them.  (Wilson Decl., ¶ 8;

Wilson Deposition Transcript ("Wilson Depo."), 25:8-25:19, attached to Stride Declaration as

Ex. 1.)  Wilson did, however, look at page 8 of Entercom SF's DH Meeting power point

presentation because Mahalick had directed him to that page.  (*Id.*; Wilson Depo., 49:11-51:11.)

That page described the changes in media revenue sources from 1997 to 2015.  (Mahalick Decl.,

¶ 27, Ex. 7.)

      Mahalick also sent Wilson a Wall Street Journal article that Jack Hutchison,

Entercom Seattle's Market Manager, had circulated (Mahalick Decl., Ex. 10) and a

---

[2] Proffitt saw this document for the first time at his deposition on April 20, 2009.  (Proffitt Deposition
transcript ("Proffitt Depo."), 110:8-110:19, attached to Jon P. Stride Declaration ("Stride Decl."), as
Ex. 2.)  Once the promotion ran, it became public information and retained no trade secret value.
(Mike Moore Deposition Transcript ("Moore Depo."), 163:15-164.16, attached as Ex. 3 to Stride
Decl.)

congratulatory e-mail from Mahalick to Entercom Seattle employees on a successful promotion with a country artist (Mahalick Decl., Ex. 11).  Wilson has no recollection of seeing these documents. (Wilson Decl. ¶ 9)

Plaintiffs also complain about a Seattle Super Sonic's term sheet that Mahalick sent to Steven Bradshaw.  (Plaintiffs' Memo., p. 5.)  However, Mahalick received this document from someone at a radio station that Entercom Seattle did not own.  (Mahalick Decl., ¶ 26, Ex. 6.)  Wilson never saw the document and did not rely on it to negotiate Alpha Broadcasting LLC's ("Alpha") agreement with the Portland Trail Blazers. (Wilson Decl. ¶ 8)[3]

Plaintiffs also complain that Mahalick discussed certain vendors with Wilson. (Plaintiffs' Memo., p. 20.)  Mahalick did ask John Willyard, a voice personality, if he was available in the Portland market. (Mahalick Decl., ¶ 29.)  Mr. Willyard provided services to Entercom SF and Entercom Seattle because Mahalick had engaged him for those markets. Entercom Portland could have engaged him for the Portland market at any time.[4]  Moreover, Mahalick, Proffitt and Wilson had worked with Willyard for years at Citadel Broadcasting and he was well known in the industry.  (Wilson Decl., ¶ 10; Proffitt Decl., ¶ 10; Mahalick Decl., ¶ 29.)

It is unclear what Plaintiffs are contending was wrongful about the Alpha Defendants hiring of Keola Lui-Kwan.  (Plaintiffs; Memo., p. 9.)  Prior to leaving Entercom SF, Mahalick commented to Dwight Walker that Lui-Kwan's on-air performance was not strong. This was a fact that Walker already knew by reviewing Kwan's ratings.  (Dwight Walker Deposition Transcript ("Walker Depo."), 92:14-93:17, attached as Ex. 4 to Jon P. Stride Declaration (Stride Decl..)  Mahalick believed that Lui-Kwan did have potential as a program

---

[3] Wilson contacted an acquaintance in Oklahoma (new home of the Oklahoma City Thunder) to get some ideas on negotiating additional broadcast inventory.  (Wilson Decl. ¶ 8.)
[4] Mike Moore, Entercom Portland KWJJ Program Director waited until after Mahalick left Entercom SF to contact Willyard.  Moore was not planning to replace anyone.  Even then, his contact was only to potentially add to an already excellent group of voice talent.  (Moore Depo., 168:16-173:24; 259:1-261:11.)

director and told Wilson about him.  (Mahalick Decl., ¶ 22 and Ex. 13.)  However, after that time, Walker gave Lui-Kwan an opportunity to demonstrate his program director skills as an interim replacement for Mahalick and found him wanting.  Although Walker gave Lui-Kwan an interview for the permanent position, Walker had no intention of hiring him.  (Walker Depo., 82:7-83:5.)  At this point, Lui-Kwan was working without a contract (it had expired on October 28, 2009.)  When he did receive a contract proposal from Walker, it was below offers that he had already received from the Phoenix, San Diego and Portland markets.  He had no intention of returning to Entercom SF.  (Keola Lui-Kwan Declaration ("Lui-Kwan Decl."), ¶¶ 2-3, filed herewith.)

### D.    Wilson Wanted to Work With His Old Citadel Team at Alpha Broadcasting

Wilson hoped to assemble the group that had helped him become so successful at Citadel Broadcasting.  That included Proffitt, Mahalick and talk radio expert, Brian Jennings.  (Wilson Depo., 4:22-5:24; 199:1-200:1)  Proffitt was interested in joining Alpha Broadcasting and helped Wilson discuss compensation terms with Mahalick and Jennings.  (Proffitt Decl., ¶ 6; Proffitt Depo., 138:22-141:15; 61:23-62:2; 59:17-60:4.)

Mahalick was interested in joining Alpha if he could gain a release from his contract with Entercom SF and Entercom Seattle.  (Mahalick Decl. ¶ 14.)  He informed Proffitt and Wilson that he was working on negotiating that release with Dwight Walker (Entercom SF Market Manager), Jack Hutchison (Entercom Seattle Market Manager) and Deborah Kane (Entercom Communications Corp. Regional President covering Seattle and San Francisco).  (Mahalick Decl., ¶ 14; Proffitt Decl., ¶ 7.)  Wilson and Proffitt told Mahalick that Alpha would hire him only if he were successful in obtaining a release from Entercom SF and Entercom Seattle.  (Proffitt Decl., ¶ 7 and Ex. 3.)  Based on reports from Mahalick, Proffitt believed that Mahalick's release was imminent, so he began developing compensation terms and

communicating those to Mahalick. (Proffitt Decl., ¶¶ 6-9 and Ex. 1.;[5] Proffitt Depo. 136:13-137:5.)

At the time of Mahalick's discussions with Walker, Kane and Hutchison, Mahalick believed if he could not reach an agreement to be release from his employment agreements he would have to stay at Entercom SF and Entercom Seattle until February 27, 2009. So that is exactly what he told Entercom SF and Entercom Seattle that he would do. (Mahalick Decl., ¶ 13, Ex. 12.)

On August 13, 2009, Mahalick sent an e-mail to Proffitt and Wilson stating that he could be free to join Alpha "as earlier [sic] as tomorrow." (Proffitt Decl., ¶ 9, Ex. 4.) Proffitt believed that Mahalick had reached an agreement with Entercom SF and Entercom Seattle for a release. Based on that belief, Proffitt asked Mahalick to sign the July 29, 2009 compensation terms, which included a statement that the offer was based on Mahalick's release from Entercom SF and Seattle. (Proffitt Decl., ¶¶ 8-9, Ex. 3.)

Alpha, Wilson and Proffitt were motivated to hire Mahalick because they were long-time friends with him and knew him to be a good program director and for no other purpose. (Wilson Decl. ¶ 15; Proffitt Decl. ¶ 19.) Entercom Communications Corporation President Deborah Kane admits that this was the Alpha Defendants' sole motivation to hire Mahalick. (Deborah Kane Deposition Transcript ("Kane Depo."), 255:22-256:23 attached as Ex. 5 to Stride Decl.)

**E.**     **Alpha's Use of the Slogan "Beat the Bank"**

In 2007 and 2008 while he was employed at Entercom SF and Entercom Seattle, Mahalick executed a promotion that he called "Beat the Bank.", which had been run across the

---

[5] Plaintiffs point to these documents as evidence that Alpha considered Mahalick as part of the "Alpha team" and that the Alpha Defendant knew that Mahalick was going to walk out on his contract with Entercom SF and Entercom Seattle. (Plaintiffs' Memo., p. 8.) The documents themselves lead to the opposite conclusion – that Alpha would not hire Mahalick until he had successfully obtained a release from Entercom SF and Entercom Seattle.

country under different names.  (Mahalick Decl., ¶ 31; Walker Depo., 232:3-234:4; Jack Hutchison Deposition Transcript ("Hutchison Depo."), 115:3-7 attached as Ex. 6 to Stride Decl.; Moore Depo., 160:11-161:5.)  Entercom SF and Entercom Seattle authorized and even encouraged his use of the "Beat the Bank" name for the promotion.  At no time did Entercom SF or Entercom Seattle object to the use of this name or question whether this was an improper use of a registered trademark.  (Mahalick Decl., ¶ 30.)

When Mahalick joined Alpha in Portland, Moore, Entercom Portland's Program Director for the KWJJ station, became concerned that Mahalick might try to run the same promotion at Alpha's KUPL station.  Moore checked to see if the name was registered as a trademark and when he found that it was, he wanted Entercom Portland to enter a license agreement with the trademark owner so that he could stop Alpha from using the promotion. (Moore Depo., 150:8-151:2.)  Entercom Portland secured a license to use the trademark from Finest City Broadcasting ("FCB") on September 17, 2009.  (Stride Decl., ¶ 9 and Ex. 8.)  FCB had never used the trademark in the Portland market.  Moreover, FCB had only used the mark once over a couple weeks in the San Diego market in 2006.  (Stride Decl., ¶ 10 and Ex. 9.)

Moore could have, but did not, contact Mahalick and Alpha to provide notice to them that Entercom Portland had obtained an exclusive license to use the mark BEAT THE BANK in the Portland, Oregon market.  Instead, Moore waited until Alpha's KUPL station began airing a promotion called "Beat the Bank" on September 27, 2010.  Moore heard radio advertisements and saw TV advertisements, so he had to be aware that Alpha had invested substantial sums on the promotion before Entercom Portland sent a cease and desist letter to Alpha on September 28, 2010.  (Moore Depo., 149:24-151:20; Proffitt Decl., ¶ 14 and Ex. 5.) Entercom Portland sent Alpha the cease and desist letter before acquiring the right to enforce the mark and without any evidence of Entercom Portland's claimed rights.  (Stride Decl., ¶ 11 and Ex. 10.)

At the time Entercom Portland sent a cease and desist letter to Alpha to demand that Alpha stop using the mark, Entercom Portland had not secured the rights to enforce the mark. Alpha asked Entercom Portland to produce evidence that it had a valid license and right to enforce it, but Entercom Portland did not produce it until well after Alpha had stopped using the mark. (Proffitt Decl., Ex. 6; Stride Decl., ¶ 9.)

Entercom Portland's only attempt to use the mark BEAT THE BANK in the Portland market was to attach a few pages of a promotional concept to an e-mail and to send it unsolicited to Lettie Price at Wells Fargo Bank. This communication sought a substantial payment from Wells Fargo to be a promotion sponsor. Ms. Price and Wells Fargo never responded to the e-mail. (Moore Depo., 144:12-147:8, Stride Decl. ¶12 and Ex. 11.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). The burden is on the moving party to demonstrate that no genuine issue of material fact exists. *Celotex*, *supra,* 477 U.S. at 323.

To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, *supra,* 477 U.S. at 322; *Anderson*, *supra,* 477 U.S. at 248.

In deciding whether there is a genuine issue of material fact, the court is to view the record in the light most favorable to the party opposing the motion, giving the non-movant the benefit of all favorable inferences that can reasonably be drawn from the record and the benefit of any doubt as to the existence of any genuine issue of material fact. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge whether he is ruling on a motion of summary judgment or a directed verdict." *Adickes*, 398 U.S. at 158-59, 90 S. Ct. at 1608-09.

## III.    LEGAL ARGUMENT

### A.    Choice of Law for Aiding and Abetting and Tortious Interference Claims

Before addressing the substantive law that governs Plaintiffs' claim that the Alpha Defendants aided and abetted Mahalick's breach of his fiduciary duties and their claim that the Alpha Defendants tortiously interfered with Mahalick's employment agreement, the Court must first decide what state's law applies to each claim. The choice of law questions are complicated by the fact that Mahalick was employed by Entercom SF and Entercom Seattle. They are further complicated by the fact that each of these claims is predicated on Mahalick being liable for an underlying claim (i.e., that Mahalick breached his fiduciary duties and that he breached his contracts). Therefore, the Court must determine what law applies to the underlying claims against Mahalick and then determine the law that applies to the claims against the Alpha Defendants.

The Court must apply Oregon's choice of law rules because this case is pending in Oregon. *Fields v. Legacy Health Systems*, 413 F.3d 943, 951 (9th Cir. 2005). Under those rules, the Court must first determine whether an actual conflict exists among the law that may apply to the substantive claims. *DeFoor v. Lamatta*, 249 Or. 116, 119, 437 P.2d 107 (1968). If no conflict exists, then Oregon law applies. *Cropp v. Interstate Distributor Co.*, 129 Or.App. 510, 880 P.2d 464 (1994).

As we will show below, the substantive law of Washington, Oregon and California is not materially different for Plaintiffs underlying claims against Mahalick or against the Alpha Defendants that are the subject of Plaintiffs' summary judgment motion. Therefore,

Oregon law applies to these claims.  The one exception to this rule is that the Court must enforce the California choice of law provision in Mahalick's employment agreement. *M+W Zander, U.S. Operations, Inc. v. Scott Co. of California,* 190 Or.App. 268, 272 (2003).

**B.    The Alpha Defendants did not Aid and Abet Defendant Mahalick's Alleged Breach of Fiduciary Duty**

Plaintiffs' claim against the Alpha Defendants for aiding and abetting Mahalick's breach of fiduciary duty depends upon proving their breach of fiduciary duty claim against Mahalick.  If the material facts or the reasonable inferences that can be drawn from them are disputed as to Mahalick's breach of fiduciary duty, then the Court must deny Plaintiffs' summary judgment motion against the Alpha Defendants for aiding and abetting those alleged breaches. Even if the Court finds that summary judgment is proper against Mahalick on the breach of fiduciary duty claim, it must deny Plaintiffs' motion against the Alpha defendants if the facts supporting the aiding and abetting claim are disputed.

1.    Summary judgment is improper on Plaintiffs' breach of fiduciary duty claim against Mahalick.

Plaintiffs' breach of fiduciary duty claims against Mahalick fall into three categories:  1) misappropriating Entercom's confidential or trade secret information; 2) planning prospective employment with Alpha; and, 3) recommending against extending a contract to Keola Lui-Kwan.  (Plaintiffs' Memo., pp. 3 – 6.)  Each of these categories are addressed separately below.

a.    The Uniform Trade Secrets Act supersedes claims based on misappropriation of confidential information and trade secret.

Plaintiffs submit documents that they contend contain confidential and trade secret information that they allege Mahalick misappropriated and forwarded to one or more of the Alpha Defendants.[6]  (Plaintiffs' Memo., pp 4 – 6.)  Plaintiffs' breach of fiduciary duty claim

---

[6] The six documents are 1) e-mail congratulating Mahalick on successful promotion with a country singer (Mahalick Decl., Ex. 11); 2) e-mail from Seattle manager enclosing a Wall Street Journal article (Mahalick Decl., Ex. 10); 3) Mahalick's comments on listening to stations in the Portland market (Mahalick Decl., Ex. 5); 4) terms of Seattle Super Sonics' game broadcast (Mahalick Decl., Ex. 6.); 5)

premised on Mahalick's misappropriation of confidential and trade secret information is superseded by the Uniform Trade Secrets Act as adopted in Oregon, California and Washington. *Alternative Legal Services, Inc. v. Ferman Management Services, Inc., et al*, 2008 WL 65584 (D. Or. 2008); *Acrymed, Inc. v. Convatec*, 317 F.Supp. 1204, 1217 (D. Or. 2004)("Where the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of the [OUTSA]."); Cal. Civ. Code § 3426.7; *See Ramona Manor Convalescent Hosp. v. Care Enterprises,* 177 Cal.App.3d 1120, 1130 (1986); R.C.W. 19.108.900. *Thola v. Henschell,* 140 Wash.App. 70, 78 (2007).

The Uniform Trade Secrets Act is intended to be construed broadly to effectuate its purpose to "create a more uniform business environment that created more certain standards for protecting commercially valuable information." *Mortgage Specialists, Inc. v. Davey*, 153 NH 764, 776, A.2d 652, 663 (2006), quoting *Auto Channel, Inc. v. Speedvision Network. LLC*, 144 F.Supp.2d 968, 971 (ND Ill. 2001); ORS 646.475(1). This preemption provision "was meant to codify all the various common law remedies for theft of ideas." *Id*., quoting *Thomas & Betts Corp. v. Panduit Corp.*, 108 F.Supp.2d (ND Ill. 2000). Therefore, it follows that to the extent Plaintiff's breach of fiduciary duty claim against Mahalick is based on Mahalick's alleged misappropriation of confidential information or trade secrets, the claim is preempted and must be dismissed.[7]

> b.    Mahalick was entitled to plan for his eventual employment with Alpha.

In addition to supplying documents to some of the Alpha Defendants, Plaintiffs contend that Mahalick breached his fiduciary duty by (1) attending a meeting of potential

---

power point presentation to Entercom [  ] managers (Mahalick Decl., Ex. 7); and 6) presentations script for "Sing Like Taylor Swift" promotion (Mahalick Decl., Ex. 9).
[7] Plaintiffs have not moved for summary judgment on their Misappropriation of Trade Secrets claim, therefore, we do not address whether the information that they allege Mahalick disclosed actually constitutes a trade secret.

investors on April 27, 2009 in San Francisco[8], (2) listening to radio stations in the Portland market and providing his comments to Wilson and Proffitt[9]; and, (3) negotiating terms of compensation with Proffitt before he left Entercom SF and Entercom Seattle.  (Plaintiffs' Memo., p. 3 - 4.)  None of these actions were a breach of Mahalick's duties to Entercom SF and Entercom Seattle.  All of these actions fall within Mahalick's rights as an employee as provided by the Restatement sections cited below.

 The Alpha Defendants concede that Mahalick owed a fiduciary duty to Entercom SF and Entercom Seattle.  *See Western* Medical *Consultants, Inc. v. Johnson,* 835 F.Supp. 554, 558 (1993); *Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 414 (2007); *Kieburtz & Associates, Inc. v. Rehn,* 68 Wash.App. 260, 265-266 (1992).  That duty provides that an employee may not take any actions that are inimical to the best interests of the employer.  *Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 414 (2007) *Citing Stokes v. Dole Nut Co.,* 41 Cal.App.4th 285, 295 (1995).

 Oregon, Washington and California have recognized the Restatement (Second) of Agency as authority on the duty of loyalty.  Under Restatement (Second) of Agency § 393, an agent owes her principal a fiduciary duty of loyalty; she may not compete with her principal during the course of her employment concerning the subject matter of her agency.  *Western Medical Consultants, Inc. v. Johnson,* 835 F.Supp. 554, 558 (1993).  This duty is not absolute, however.  The agent may compete after the termination of her agency and may take steps in preparation to compete before the termination of her agency.  *Id.*  In *Western Medical* the court found against any breach of fiduciary duty where, before resigning, the defendant's preparatory acts included flying to Alaska to research the location and "utilizing general logistical information and know-how acquired through her general employment and experience."  *Id.* at

---

[8] The meeting was for the purpose of discussing Citadel Broadcasting and Susquehanna as potential investment targets for Wilson and others. (Wilson Depo. 59:9-60:17.)  It had nothing to do with Wilson's acquisition of an interest in Alpha.  (Wilson Decl. ¶ 7.)  Moreover, Mahalick took a vacation day from Entercom SF to attend the meeting.  (Mahalick Decl., ¶ 19.)
[9] This allegation should be dismissed or preempted by the UTSA.  However, we address it here to explain another basis to dismiss it.

559.  There, the defendant was preparing to compete in a market in which her employer was not engaged, despite knowing that her employer desired to expand into the remote market (which he eventually did).  *Id.* at 557.

Under the Restatement (Second) of Agency § 393, comment (e), "[E]ven before the termination of the agency, the [agent] is entitled to make arrangement to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein.  Thus, before the end of employment, he can properly purchase a rival business and upon termination of employment immediately compete."  The Restatement (Third) of Agency §§ 8.04, comment c, clearly explains:  "In general, an employee or other agent who plans to compete with the principal does not have a duty to disclose this fact to the principal.  To be sure, the fact that an agent has such a plan is information that a principal would find useful, but the agent's fiduciary duty to the principal does not oblige the agent to make such disclosure. . . .  In this respect, the social benefits of furthering competition outweigh the principal's interest in full disclosure by its agents."  *See also American Republic Ins. Co. v. Union Fidelity Life Ins. Co.*, 470 F.2d 820, 824 (9th Cir. 1972); *Kopka, Landau & Pinkus v. Hansen*, 874 N.E. 2d 1065, 1071 (2007).

Plaintiffs contend, without offering any authority, that at least Mahalick's comments on the Portland radio stations breached his duty of loyalty because he was providing information to a competitor.  (Plaintiffs' Memo., p. 4.)  However, it is undisputed that only Entercom SF and Entercom Seattle were Mahalick's employers.  The country music station that Alpha eventually acquired, KUPL, was a competitor of Entercom Portland's KWJJ.  Alpha's KUPL did not compete with Entercom SF or Entercom Seattle's country stations.  Entercom SF identifies its competitors as the radio stations in the San Francisco Metro Survey Area as defined by Arbitron Ratings Company.  (Mahalick Decl., Ex. 1, ¶ 5.a.)  Entercom SF and Entercom Seattle cannot maintain the liability limitation structure that separate LLCs afford for some

purposes and then look through their own corporate forms to assert that Entercom SF, Entercom Seattle and Entercom Portland are all one company when it is convenient to do so in this lawsuit.

Mahalick's attendance at the April 27, 2009 meeting with Wilson, his comments on the Portland radio market and his negotiations with Proffitt regarding prospective compensation terms were not prohibited by his fiduciary duties to Entercom SF and Entercom Seattle. Mahalick disclosed no confidential information regarding Entercom SF or Entercom Seattle in taking of any of these actions. (Mahalick Decl., ¶ 20.) Therefore, Plaintiffs' summary judgment motion regarding these claimed breaches should be denied.

c.    Mahalick's assessment of Keola Lui-Kwan's ability was not a breach of his fiduciary duty.

Keola Lui-Kwan was employed at Entercom SF as an on-air personality and as a music director at Entercom SF's country station. Keola Lui-Kwan Deposition Transcript ("Lui-Kwan Depo."), 7:1-16, attached as Ex. 7 to Stride Decl.) In the Spring of 2009 Walker, Entercom SF's Manager, talked with Mahalick about Lui-Kwan's on-air performance. Mahalick told Walker what Walker already knew from the Arbitron ratings for Lui-Kwan's afternoon time slot – that his ratings were not very good. (Walker Depo., 92:14-24.) Based on that information, Walker and Mahalick agreed that Entercom SF should wait before extending a new contract to Lui-Kwan.[10] (Id., 295:18-296:7; Mahalick Decl., ¶ 23.) In any event, the budget freeze imposed on Entercom SF prevented Walker from making an offer to Lui-Kwan at that time. (Walker Depo., 93:2-17.)

Mahalick later told Wilson in an e-mail that Lui-Kwan had the potential to be a super star as a programmer. (Mahalick Decl., ¶ 23 and Ex. 13.) However, after Mahalick left Entercom SF, Walker appointed Lui-Kwan as an interim program director at the country station (with no additional compensation). Walker interviewed Lui-Kwan for the permanent program director position but had no intention of hiring him because Walker did not believe that Lui-

---

[10] Lui-Kwan's contract with Entercom SF expired on October 28, 2009. (Lui-Kwan Depo., 45:3-9, Stride Decl., Ex. 7.)

Kwan had the right skill set.  (Walker Depo., 82:7-83:5.)  Instead, after Lui-Kwan's contract had expired, Walker offered Lui-Kwan a contract as an on-air personality at Lui-Kwan's 2009 compensation rate.  (Walker Depo., 120:20-127:24; Lui-Kwan Decl., ¶ 3.)

Because he was uncertain about his position at Entercom SF, Lui-Kwan pursued offers in Phoenix, San Diego and Portland.  He received offers from each market at higher compensation than Entercom SF had offered.  After being turned down for the program director's position and receiving a low compensation offer from Entercom SF, Lui-Kwan did not pursue further negotiations with Entercom SF.  (Lui-Kwan Decl., ¶ 3 and Ex. 2.)

Mahalick's statement to Walker about Lui-Kwan's on-air performance was truthful and consistent with what Walker already knew from the Arbitron ratings.  That Walker disagreed with Mahalick's assessment of Lui-Kwan's programming ability and that Alpha later hired Lui-Kwan to work for Alpha doesn't make his statement to Walker a breach of his fiduciary duty.  Plaintiffs summary judgment motion on Mahalick's breach of fiduciary duty related to Lui-Kwan should be denied.

Based on the forgoing, the Court should deny Plaintiffs' summary judgment motion on the beach of fiduciary duty claim against Mahalick.  It follows that the Court must also deny Plaintiffs' summary judgment motion on their claim that the Alpha Defendants aided and abetted Mahalick's breach of fiduciary duty.

2.    None of the Alpha Defendants aided and abetted Mahalick's breach of his fiduciary duty.

Even if the Court grants Plaintiffs' summary judgment motion as to some aspect of their breach of fiduciary duty claim against Mahalick, it must deny the motion as to Plaintiffs' claim that the Alpha Defendants aided and abetted Mahalick's alleged breach.

Under Oregon, California and Washington law, aiding and abetting the commission of a breach of fiduciary duty requires proof that one who aids and abets the commission of an intentional tort knows the other's conduct constitutes a breach of a duty and

gives "substantial assistance or encouragement to the other to so act. . . ."  *Casey v. U.S. Bank National Assoc.*, 127 Cal.App.4th 1138, 1144 (2005) (citing the Restatement (Second) of Torts); also see *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1118 (CD Cal. 2003); *see also Granewich v. Harding*, 329 Or. 47 (1999)(also citing section § 876(b) of the Restatement (Second) of Torts that defines a cognizable claim under Oregon law, requiring "substantial assistance or encouragement" to others to violate their fiduciary duties).  In *Reynolds v. Schrock*, 197 Or.App. 564 (2005) rev'd on other grounds, 341 Or. 338, 142 P.3d 1062 (2006), the court adopted a "strict and narrow construction" of the tort and held that "'substantial assistance' or 'encouragement' of the client's breach of fiduciary duty would consist of, for example, affirmative conduct that actually furthers the client's breach of fiduciary duty."  *See also Lattue v. Keystone Inv. Co.,* 6 Wash.App. 765, 783 (1972); *Swartz v. Deutsche Bank*, 2008 WL 1968948 (W.D. Wa. 2008).

  "Aiding and abetting…. necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Lomita Land Water Co. v. Robinson* 154 Cal. 36, 97 (1908); *also see Howard v. Superior Court*, 2 Cal.App.4th 745 (1992).  In other words, the defendant must have the specific intent to facilitate the tort which the aider/abettor has actual knowledge is being committed by the third party.  *Gerard v. Ross*, 204 Cal.App.3d 968, 983 (1988).

  Plaintiffs identify the following conduct as their "undisputed" evidence that the Alpha Defendants have aided and abetted Mahalick's breach of his fiduciary duties:

Documents:

- On March 26, 2009 Mahalick e-mailed comments to Wilson on the status of digital radio in the industry and provided website links to publicly available information on the subject (Mahalick Decl., Ex. 4);

- On July 8, 2009 Mahalick e-mailed an industry consultant to ask him to listen to the Portland radio stations and provide comments (Mahalick Decl., Ex. 14); and,

- On July 10, 2009 Mahalick e-mailed Wilson and Proffitt his written comments after listening to the Portland radio stations (Mahalick Decl., Ex. 5);

Actions:

- On April 27, 2009 Mahalick attended a meeting with Wilson and Proffitt, the subject of which was a potential investment in broadcasting companies (which never occurred); and

- Mahalick and Proffitt communicated back and for about compensation terms in the event Mahalick was able to join Alpha.

(Plaintiffs' Memo., pp. 6 – 9.)  As we explained above in section III. B. 1. above, none of these actions constitute a breach of fiduciary duty by Mahalick. Certainly neither Wilson nor Proffitt believed that Mahalick was committing a breach of his duties by these actions.  (Wilson Decl., ¶ 13; Proffitt Decl., ¶ 17.)  The Alpha Defendants could not have formed the intent to aid the commission of a breach of fiduciary duty by Mahalick when they knew that Entercom SF and Entercom Seattle did not compete in the Portland market and that Mahalick was entitled to make comments about the Portland radio market as long as he did not use Entercom SF or Entercom Seattle's confidential information to do so.  Also, Proffitt could not have formed the intent to aid a breach of fiduciary duty by communicating with Mahalick about compensation when Mahalick was entitled to have those conversations.  Mahalick's communications to them referenced negotiations that Mahalick was engaged in with Walker, Kane and Hutchison over his release (Proffitt Decl., ¶ 6; Ex. 2.)  Hence, during the entire time that Proffitt was discussing prospective compensation with Mahalick, he and Wilson believed that Mahalick could join Alpha only if Entercom SF and Entercom Seattle released Mahalick from his employment agreement.  (Proffitt Decl., ¶ 6; Wilson Decl.. ¶ 12.)

For the reasons stated in section III. B. 1. a., above, to the extent Plaintiffs' aiding and abetting claim is based on information that Mahalick provided to Wilson and/or Proffitt, that claim is preempted by the Uniform Trade Secrets Act. *See e.g., KC Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* 171 Cal.App.4th 939 (2009)(preempting common law breach of confidence, and aiding and abetting such breach).  Moreover, when Mahalick gave his

March 26, 2009 comments about digital radio to Wilson, Wilson had not formed Alpha or even entered into any letter of intent to acquire a radio station.  Therefore, defendants Proffitt and Alpha have nothing to do with this claim.  At any event, Mahalick was simply commenting on publicly available industry information.  (Mahalick Decl., ¶ 19.)  It cannot be a breach of fiduciary duty to talk about it with someone else in the industry.

Intent is a necessary element of an aiding and abetting claim. And whether a defendant has the requisite intent to satisfy this element is reserved for the jury to decide. *Commodity Futures Trading Commission v. W. Savage,* 611 F.2d 270, 283 (9th Cir. 1980) ["[g]enerally, when intent is at issue, a jury should be allowed to draw its own inferences… unless all reasonable inferences defeat [the] claims."].  Therefore, the Court should deny Plaintiffs summary judgment motion on the claim against the Alpha Defendants for aiding and abetting Mahalick's breach of fiduciary duty.

### C.    The Alpha Defendants Did Not Tortiously Interfere with Defendant Mahalick's Employment Agreement

Plaintiffs do not specify the conduct that they allege the Alpha Defendants engaged in that constitutes a tortious interference with Entercom SF and Entercom Seattle's contract with Mahalick, other than to say that it is the same as the aiding and abetting conduct. (Plaintiffs' Memo., p. 20.)  However, of the five bullet-point items listed in section III. B. 2., above, the only one that has a passing relevance to Plaintiffs' tortious interference with contract claim is the allegation that Alpha began compensation discussions with Mahalick in July of 2009 and encouraged him to join Alpha.  Yet, even this allegation is insufficient to state a claim for tortious interference with contract for two reasons.  First, this is an intentional tort.  The evidence is that none of the Alpha defendants intended to interfere with Mahalick's contract.

Second, to establish a claim for tortious interference, Plaintiffs must prove that the Alpha Defendants acted with an improper motive or improper means.  They did neither.

1.    <u>The Alpha Defendants did not intend to interfere with Mahalick's contract</u>.

The very evidence on which Plaintiffs rely to make their sweeping conclusion that Alpha was treating Mahalick as "one of their team" actually supports the conclusion that the Alpha Defendants never had intent to interfere with Mahalick's contract.

Plaintiffs admit that Wilson informed Mahalick that Alpha couldn't employ him until he secured a release from Entercom SF and Seattle.  (Plaintiffs' Concise Statement Material Facts, ¶ 4.)  During July and early August of 2009, Mahalick communicated with Wilson and Proffitt about his negotiations with Walker, Kane and Hutchison to secure that release. (Mahalick Decl., ¶ 14 and Ex. 12.)  When Proffitt communicated with Mahalick about joining Alpha it was always with the understanding that Mahalick must first negotiate his release from the Entercom SF and Seattle contract. (Proffitt Decl., ¶ 7; Ex. 3.)  Based on Mahalick's statements, Proffitt concluded that Mahalick's release was imminent. So on July 29, 2009, Proffitt sent Mahalick a final compensation proposal. He prefaced his proposal with the following words, "Based on your feeling that Entercom will release you from your contract early, Larry and I are delighted to offer you a position with Alpha Broadcasting in Portland, Oregon." (*Id.*)

When Mahalick sent an e-mail to Proffitt on August 13, 2009 stating that "I can be free as earlier [sic] as tomorrow,"  Proffitt reasonably concluded that Mahalick had successfully negotiated the release.  (Proffitt Decl., ¶ 9.)

Only one reasonable inference can be drawn from this evidence, and that is that the Alpha Defendants were careful not to offer Mahalick a position with Alpha until Entercom SF and Seattle had released him from his contract.

2.    <u>The Alpha Defendants did not act with an improper means or improper motive</u>.

The tort of intentional interference with contract requires proof of  1) the existence of a contract; 2) intentional interference with that contract; 3) by a third party; 4) accomplished through an improper means or for an improper purpose; and 5) causal relationship

between the interference and damage to the economic relationship; and 6) damages. *McGant v. Staudenraus*, 321 Or. 532, 535, 901, P.2d 841 (1995); *See also Pleas v. Seattle,* 112 Wash.2d 794, 800, 774 P.2d 1158 (1998) quoting *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371, 374 (1979)(same); and *Ramona Manor Convalescent Hosp. v. Care Enterprises,* 177 Cal.App.3d 1120, 1130 (1986).

Although Plaintiffs do not repeat the allegations in their summary judgment motion, in the FAC Plaintiffs allege that the Alpha Defendants interfered with Mahalick's contract with the improper motive of denying Entercom SF and Entercom Seattle of Mahalick's services.  (FAC, ¶ 152.) Plaintiffs have offered no evidence of that motive to support their summary judgment motion.  In fact, Deborah Kane, Entercom Communications Corp.'s Regional President with responsibility for Entercom SF and Entercom Seattle admitted that the Alpha Defendants were solely motivated by a desire to work together again since they had enjoyed a good working relationship at Citadel Broadcasting.  (Kane Depo., 255:22-256:5.)  Kane was correct in that admission. (Proffitt Decl., ¶ 19; Wilson Decl., ¶ 15.)

Plaintiffs allege that the Alpha Defendants' improper means was to acquire Plaintiffs' trade secrets.  (FAC, ¶ 153.)  This claim is preempted by the Uniform Trade Secrets Act.  *Alternative Legal Services, Inc. v. Ferman Management Services, Inc., et al*, 2008 WL 65584 (D. Or. 2008); *Acrymed, Inc. v. Convatec*, 317 F. Supp. 1204, 1217 (D. Or. 2004); *See Ramona Manor Convalescent Hosp. v. Care Enterprises,* 177 Cal.App.3d 1120, 1130 (1986) and *Thola v. Henschell,* 140 Wash. App. 70, 78 (2007).

Plaintiffs have not offered any evidence that the Alpha Defendants acted with an improper motive or that they accomplished the interference with an improper means. In any event, their improper means is superseded by the UTSA.  Therefore, the Court should deny Plaintiffs' summary judgment motion on their tortious interference claim against the Alpha Defendants.

3.      Mahalick's Employment Agreement is not enforceable.

Plaintiffs' tortious interference claim is premised on the conclusion that Mahalick has breached his employment agreement with Entercom SF and Entercom Seattle. If, as defendant Mahalick argues, his employment agreement is unenforceable or otherwise not breached, then Plaintiffs cannot maintain a claim against the Alpha Defendants for interference with the agreement. Accordingly, the Alpha Defendants join Defendant Mahalick's argument on that clause and incorporate it herein by reference.

D.    **Plaintiffs' Motions for Summary Judgment on their Trademark Infringement and Unfair Competition Claims should be dismissed**

1.      Basis of the claims.

Plaintiffs' Trademark Infringement claim is legally based on Entercom Portland's "naked" license[11] from a federal registrant to use the phrase "Beat The Bank" in a radio promotion in Portland. (Plaintiffs' Memo., p. 24.) Plaintiffs' Unfair Competition claim is based on the alleged acquired common-law trademark rights that Entercom SF and Entercom Seattle acquired by using the trademark. (Plaintiffs' Memo., p. 28.) Each claim is factually based on Alpha's use of the phrase "Beat The Bank" on its Portland, Oregon radio station, KUPL, to refer to an on-air radio contest with that name. Entercom Portland is not entitled to assert either of these alleged legal rights against Alpha.

Plaintiffs' Federal Trademark Infringement and Unfair Competition claims seem hardly more than a means to harass Alpha. After all, when Entercom Portland sent a cease and desist letter to Alpha on January 28, 2010 to demand that Alpha stop using the mark BEAT THE BANK, Alpha pulled its ads and changed its promotion in a week. (Proffitt Decl., ¶¶ 15-16.) Alpha did so in spite of the fact that Entercom Portland did not provide any evidence to Alpha that it had a right to exclude Alpha from using the mark. (*Id.*) Alpha responded within the five

---

[11] Entercom Portland has the burden of establishing a valid license, and to do so, they must show that the licensor actually exercises supervision and control over the operations of its licensees. Without such supervision, the license is naked and therefore invalid. *Dawn Donut C. v. Hart's Food Stores, Inc.*, 267 F. 2d 358, 366-367 (2nd Cir. 1959) [licensor has an affirmative duty].

days that Entercom Portland's cease and desist letter demanded.  In Alpha's response letter, Alpha committed to discontinue using the mark and provided a short timetable for the phase out. Alpha also asked Entercom Portland to provide evidence of its rights in the trademark (such as a license agreement), but Entercom Portland never provided any evidence of its alleged rights.[12] (Proffitt Decl., ¶ 15 and Ex. 6.)

Nonetheless, Plaintiffs complain that Alpha's use of the mark has prevented Entercom Portland from being able to use the mark.  (Plaintiff's Memo., p. 12.)  Of course, if Entercom Portland was truly concerned about using the mark without the risk that Alpha would first use it in the Portland market (and thereby, according to Plaintiffs, prevent Entercom Portland's use), then Entercom Portland would have given Alpha notice of its rights in the mark as soon as it acquired those rights in a September 17, 2009 license agreement.[13]

That Entercom Portland did not give Alpha notice of its alleged rights exposes its real motive – to interfere with Alpha's use of the mark after Alpha had invested substantial sums in advertising and promoting "Beat the Bank" promotion.  Testimony from Entercom Portland's country program director, Mike Moore, supports this motive.  Moore believed that Mahalick would try to use the "Beat the Bank" promotion at Alpha and he wanted to get a license for the mark so that Entercom Portland could stop Alpha from running that promotion. (Moore Depo., 150:8-151:2.)  Moore had every reason to believe that Mahalick would use the "Beat the Bank" promotion for Alpha.  The "Beat the Bank" name and promotion was an idea Mahalick introduced to Entercom SF and Entercom Seattle.  (Walker Depo., 232:3-234:1.)  He thereafter used the "Beat the Bank" name for the promotions that he ran in Seattle and San Francisco with

---

[12] It wasn't until Entercom Portland responded to Alpha's discovery in this case that defendants became aware of the FCB/Entercom Portland license agreement.  (Stride Decl., ¶ 9.)

[13] If Alpha had investigated to determine whether it had a right to use the BEAT THE BANK mark in Portland it would have found the federal registration for FCB, a San Diego broadcasting company.  It would not have found any evidence of a license from FCB to Entercom Portland.  The federal registration for a San Diego company that had not used the mark in the Portland territory would not prevent Alpha from using the mark.  (See section E.1., below.)

PAGE 23 -  **DEFENDANTS ALPHA BROADCASTING, LLC, LARRY WILSON, AND ROBERT PROFFITT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Entercom SF and Entercom Seattle's support and encouragement even after FCB had registered the mark.  (Mahalick Decl., ¶ 30.)

Moreover, as we will show below, a registered trademark owner (or exclusive licensee) may not exclude a junior user such as Alpha unless the registrant actually uses or demonstrates an intent to use the mark within the same territory.  There is no dispute that Entercom Portland has never used the BEAT THE BANK mark in the Portland territory.  And one unanswered email to someone at Wells Fargo Bank is hardly sufficient to demonstrate an intent to use the mark.  (Moore Depo., 144.12-147:8; Stride Decl., ¶ 12 and Ex. 11.)  Hence, the reasonable inference is that Entercom Portland was intending on using its license rights as an anticompetitive weapon rather than as a basis for using the mark.

In addition to Entercom Portland's inequitable use of its licensed trademark rights, it also lacks the substantive legal basis to assert trademark and unfair competition claims against Alpha for Alpha's use of the "Beat the Bank" name for its promotion.

2.    <u>Disputed issues of material fact preclude a judgment of liability on Plaintiffs' federal trademark claim.</u>

Just last month the Ninth Circuit Court decided a case that carefully sets out the legal authority for deciding this case and provides an analytical framework for applying that legal authority to claims that are similar to Entercom Portland's claims in this case.  *Zobmondo Entertainment, LLC v. Falls Media, LLC, et al.*, 602 F.3d 1108 (9th Cir. 2010)(filed on April 26, 2010.)  In *Zobmondo*, the Ninth Circuit reviewed a district court's summary judgment in favor of defendant Zobmondo that held plaintiff Falls Media's federally registered trademark invalid.  Reversing the lower court, the Ninth Circuit held that questions of fact permeated the trademark infringement questions making summary judgment inappropriate.  *Id.*, at 1121.

"Summary judgment is generally disfavored in the trademark arena.'"  *Id.*, citing, *KP Permanent MakeUp, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002).  That is

because *"*[t]he issue of trademark validity is considered 'an intensely factual issue,'" (*Id.* citing *KP Permanent MakeUp*, 408 F.3d at 605.

      With those limitations in mind, in order to establish the right to enforce the federally registered trademark Plaintiffs must establish that: (1) the mark BEAT THE BANK is protectable; (2) Plaintiffs have either used the mark or have shown a "present intent," with concrete plans, to use the mark in Portland; and (3) Alpha's use of the mark in Portland caused "consumer confusion." Questions of fact prevent summary judgment on each of these issues.

      a.     The mark BEAT THE BANK is not protectable.

      "To claim trademark infringement, a plaintiff must have a 'valid, protectable trademark.' *Zobmondo,* 602 F.3d at 1113, citing, *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.¸ 174 F.3d 1036, 1046 (*9th Cir. *1999).* The issue of trademark validity is considered 'an intensely factual issue.' *KP Permanent MakeUp*, 408 F.3d at 605. The plaintiff bears the ultimate burden of proof in a trademark-infringement action that the trademark is valid and protectable. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927-28 (9th Cir. 2005)."

      For a mark to be "valid and protectable, the mark must be 'distinctive.'" *Zobmondo,* 602 F.3d at 1113. Distinctiveness measures "the primary significance of the mark to the purchasing public." *Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir. 2006) (quotation marks omitted). The fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)." *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:70 (4th ed. 2010) (hereinafter "McCarthy").

      Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Suggestive, arbitrary, and fanciful

marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.' *Two Pesos*, 505 U.S. at 768, 112 S. Ct. 2753.  Generic marks are not eligible for trademark protection. *Entrepreneur Media*, 279 F.3d at 1141.  Merely descriptive marks are somewhere in between generic and suggestive marks. Descriptive marks are not inherently distinctive and are therefore not entitled to automatic trademark protection; however, a merely descriptive mark can become protectable if it has acquired distinctiveness 'as used on or in connection with the applicant's goods in commerce.' 15 U.S.C. § 1052(f).  This acquired distinctiveness is referred to as 'secondary meaning.' *Two Pesos*, 505 U.S. at 769, 112 S Ct. 2735."

    The category that a mark belongs in is also a question of fact.  *See Lahoti v. Veri Check, Inc.*, 586 F.3d 1190, 1195-96 (9th Cir. 2009).  The mark BEAT THE BANK certainly presents a question of fact for the jury to decide.  As we show below, BEAT THE BANK is at most a descriptive.  It is protectable only if it has become distinctive by acquiring "secondary meaning." Plaintiffs have not presented any evidence of "secondary meaning" acquired by their use of the phrase.  In fact, FCB's use was only for a two week period over four years, making it impossible for them to establish secondary meaning.  (Stride Decl., ¶ 10, Ex. 9.)  Therefore, on that basis alone, Plaintiffs' summary judgment should be denied.

    Courts in the Ninth Circuit have generally applied the imagination test and the competitors' needs test but concede that these tests only offer guidance.  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995). "[T]he burden to show that there is no genuine issue of material fact [remains] on the moving party [], while the nonmoving party gets the benefit of reasonable inferences." *Zobmondo*, 602 F.3d at 1115.  The extent-of-use test is also used by Courts to determine whether a mark is descriptive, but is similar in analysis to the competitor's need test. *Zobmondo*, 602 F.3d at. 1118.

    Under the imagination test, "[a] suggestive mark is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance

. . . the mark does not *describe* the product's features, but *suggests* them.'  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).  By contrast, a merely descriptive mark 'describes the qualities or . . . characteristics of a good or service.'  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  It 'define[s] qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood.'  *Entrepreneur Media*, 279 F.3d at 1141-42 (quoting *Kendall-Jackson*, 150 F.3d at 1047 n.8); *see also Union Nat'l Bank of Tex., Austin, Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex*, 909 F.2d 839, 845 (5th Cir. 1990)

Whether a mark describes or suggests the goods or services of the trademark holder depends on what those goods or services are.  Accordingly, the category in which the mark falls is judged in reference to the goods or services that the mark identifies.  *Entrepreneur Media*, 279 F.3d at  1142 (the court found "entrepreneur" to be merely descriptive).  Deciding whether a "mark is distinctive or merely descriptive is far from an exact science and is a tricky business at best." *Lahoti*, 586 F.3d at 1197; 2 McCarthy § 11.66 ('The descriptive-suggestive borderline is hardly a clear one').

The mark BEAT THE BANK clearly is descriptive when considered in reference to the promotion that it identifies.  The promotion is one where the radio station acts as the "bank" in the form of a figurative ATM.  A caller calls in and, when the contest starts, the "bank," in the form of the station, starts producing twenty dollar bills.  It will continue to produce twenty dollar bills until either the contestant says stop, or the ATM "blows up."  If the contestant says stop before the ATM blows up, she wins the amount of money that was produced.  However, if the ATM blows up before the contestant says stop, she has failed to beat the bank and she wins nothing.  (Mahalick Decl., ¶ 33.)  Hence, the name "Beat the Bank" simply describes the very promotion that it identifies and requires no imagination to understand this description.  The analysis here is similar to the analysis of the mark WOULD YOU

RATHER that the Court considered in *Zombondo*. Therefore, under the imagination test, the mark BEAT THE BANK is descriptive and, as a result, invalid.

The mark BEAT THE BANK also fails the competitors' needs test. Because the mark describes the activity that comprises the on-air promotion, competitors use it to identify the promotion. As a result, a Google search of "Beat the Bank radio" turns up over 19,200,000 hits, including at least 6 radio stations that have or are using these words to describe similar promotions.[14] (Stride Decl., ¶ 13.) Applying these tests as guidelines lead to the ineluctable conclusion that locating the "descriptive-suggestive borderline" is a question of fact that must be left for the jury.

Thus, as to "protectability of the mark," there are genuine issues of material fact whether "Beat The Bank" is "merely descriptive" and, if so, whether "Beat The Bank" has a "secondary meaning." These questions preclude summary judgment.

3. Plaintiffs have neither used the "mark" nor shown a present intent and concrete plans to use the mark in Portland.

Alpha concedes that if the mark BEAT THE BANK is valid that Alpha is a junior user to FCB's federal registration. However, a junior user is entitled to use a mark in a territory in which the federal registrant has not used the mark or has not demonstrated an "appreciable intent" to use the mark. *Dawn Donut Company, Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959); *see also* McCarthy, § 26:33. Although the junior user is using the mark "on borrowed time", he is entitled to use the mark so long as the federal registrant remains outside the territory. (*Id*.)

In *Dawn Donut Company*, the court stated:

> ". . . if the use of the marks by the registrant and the
> unauthorized user are confined to two sufficiently

---

[14] The extent-of-use test also leads to the result that the mark BEAT THE BANK is descriptive based on the same Google search results. Extensive use of the mark by third parties might indicate that the mark is merely descriptive of a given class of products. *See, e.g., Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1300 (5th Cir. 1985).

> distinct and geographically separate markets, with
> no likelihood that the registrant will expand his use
> into defendant's market [footnote omitted], so that
> no public confusion is possible, then the registrant
> is not entitled to enjoin the junior user's use of the
> mark."

*Dawn Donut Company*, 267 F.2d at 364.

The facts present in this case are that Plaintiffs did not expand and have not expanded their use of the mark BEAT THE BANK into the Portland radio market where Alpha had used it. Indeed, at most, Plaintiffs sent an unsolicited email inquiry about sponsorship of a "Beat the Bank" promotion to Wells Fargo Bank and never received an answer. Moreover, no one at Entercom Portland followed up with Wells Fargo to pursue an answer. (Moore Depo., 144:12-147:8.) This falls far short of demonstrating an "present intent" to use the mark in the Portland territory.[15] *See Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.* 41 F.3d 1242, 1246 (1994) ("some evidence" of plans to expand was not strong, but creates a question of fact precluding summary judgment).

Further evidence that Entercom Portland had no real present intent to use the mark in Portland is the fact that as of May 24, 2010 it has taken no steps to use the mark. Plaintiffs contend that, because of defendant Alpha's use of "Beat The Bank" in the Portland radio market, "it would be ineffective and confusing to the public" for Entercom to "run a Beat The Bank" promotion in that market "at this time" However, Plaintiffs offer no facts to support that it would be either ineffective or confusing. It is just as logical to assume that because the BEAT THE BANK mark had never been used in Portland prior to Alpha's use, consumers may now identify this mark with the actual promotion as a result of Alpha's promotional efforts.

---

[15] We found no cases in our research where a court found an "intent to use" that was not accompanied by notice to the junior user of that intent before the federal registrant asserted infringement claims against the junior user. In the present case, Entercom Portland's alleged intent-to-use action was not public and did not (nor was it likely intended to) give Alpha notice of Entercom Portland's intent to use the mark.

Alpha had every right to run a promotion named "Beat the Bank" until a federal registrant entered the market with the mark. Questions of fact exist as to Entercom Portland's intent to use the mark BEAT THE BANK in the Portland market.

4.     <u>Plaintiffs have presented no evidence of "confusion."</u>

Likelihood of confusion is the hallmark of trademark protection. Where there is no likelihood of confusion, there is no infringement. *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 630 (9th Cir. 2005), citing *KP Permanent Make-Up v. Lasting Impression I, Inc*., --- U.S. ---, 125 S.Ct. 542, 547, 160 L.Ed.2d 440 (2004).

Plaintiffs have offered no evidence of likelihood of confusion other than to say that it is presumed where the marks are very similar. (Plaintiffs Memo., pp. 23-24.) However, Plaintiffs' argument collapses in on itself when it comes to likelihood of confusion. Entercom Portland never used the mark BEAT THE BANK. Therefore, no consumers were actually confused, nor could they likely be confused.

Plaintiffs must really be arguing that if they decide to use the mark BEAT THE BANK, then they will create the likelihood of confusion and that potential, but unknown, confusion is sufficient to support the likelihood-of-confusion element. Under Entercom Portland's theory of likelihood of confusion, Alpha would have created that confusion just by being a legal junior user. In fact, under Entercom Portland's theory, a junior user who used a mark in a remote territory for years and who stopped the minute it received notice of the federal registrant's intent to use in that remote territory would, nonetheless, be liable to the federal registrant for causing a likelihood of confusion. That absurd conclusion directly contradicts the *Dawn Donut* Rule and should be dismissed.

Accordingly, Plaintiffs cannot show any likelihood of confusion as a result of Alpha's use of the "Beat the Bank" name for its on-air promotion. This provides an independent basis for the Court to deny Plaintiffs' summary judgment motion.

E.   **Disputed Issues of Material Fact Preclude A Judgment of Liability on Plaintiffs' Federal Unfair Competition Claim**

This claim does not depend on Entercom Portland's license from FCB for the right to use the mark BEAT THE BANK.  Instead, Entercom Portland bases its allegedly exclusive "common law rights" in and to the use of the phrase "Beat The Bank" in Portland as a consequence to Entercom SF's use in San Francisco and Entercom Seattle's use in Seattle.

In the two paragraphs Plaintiffs devote to their Unfair Competition argument they assert that (1) "Plaintiffs own a valid, protectable interest in the Mark BEAT THE BANK under common law", and (2) "There is a likelihood of confusion as a matter of law." *See* Plaintiffs' Memo, p. 28.  Neither argument deserves more discussion than Plaintiffs have given, because neither is logical or meritorious.

1.   Plaintiffs do not own an exclusive "common law right" to the use of the phrase "Beat The Bank" in Portland.

Plaintiffs face two hurdles in demonstrating that Entercom Portland is the valid owner of a common-law right to the mark BEAT THE BANK.  First, common-law trademark rights are territorial.  That is, a trademark user acquires the common-law rights in a mark within the territory of use.  *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.,* 41 F. 3d 1242, 1245-1246 (8th Cir. 1994); *Emergency One, Inc. v. American Fire Eagle Engine Co., Inc.,* 332 F. 3d 264, 267 (4th Cir. 2003); 5 McCarthy § 26.4 at 26-10.  Use of a trademark in one territory does not create a right to exclude others from using that mark in other territories, even if that use is senior to the user in the other territory.  *Id.*  As applied to this case, Entercom SF's and Entercom Seattle's use in San Francisco and Seattle created no rights to use the mark BEAT THE BANK in Portland, or anywhere else for that matter.

Plaintiffs' second hurdle is that even if Entercom Seattle and Entercom SF somehow acquired the exclusive right to use the mark BEAT THE BANK in Portland by virtue of their common-law use in Seattle and San Francisco, that right did not automatically become Entercom Portland's rights.  Entercom Portland, Entercom Seattle and Entercom SF are separate

legal entities.  Entercom Portland has not alleged any right derived from either Entercom SF or Entercom Seattle by assignment or license.  That is because it does not exist.  Even if it did, it would be subject to judicial scrutiny to be sure it was in fact a valid assignment.  5 McCarthy §26.5 at 26-12.2.

        2.      <u>Plaintiffs alleged common-law mark is not protectable</u>.

Even assuming that Entercom Portland could have common-law rights in the mark BEAT THE BANK in Portland (which is cannot) the common-law mark is subject to the same challenges to protectability described in section D. 2., above.  However, the burden on Alpha to show that the common-law mark is not distinctive is less because Plaintiffs are not entitled to the presumption of distinctiveness enjoyed by a federally registered mark.  For the reasons stated in section D. 2., above, the Court should find that questions of fact exist to preclude summary judgment on this claim.

The phrase "Beat the Bank" as used by Entercom SF and Entercom Seattle is descriptive and, therefore, entitled to no protection unless it has acquired secondary meaning.  Plaintiffs have produced no evidence on either the distinctiveness of the phrase associated with their use in San Francisco and Seattle, or on any acquired secondary meaning in those markets.  Presumably, secondary meaning will be impossible to find based on only a few weeks of use of the phrase by Entercom SF and Entercom Seattle over the past three years.

        3.      <u>There is no "likelihood of confusion as a matter of law</u>."

For their "likelihood of confusion analysis" in support of their Unfair Competition claim, Plaintiffs rely, exclusively, on their Trademark Infringement claim's "likelihood of confusion analysis." *See*, Plaintiffs' Memo., p. 28.  Likewise, Alpha will rely on its response to Plaintiffs' likelihood of confusion argument in section D. 4., above, for its response to Plaintiffs' Unfair Competition claim argument of likelihood of confusion and incorporate it herein.

Alpha has identified numerous questions of fact that prevent summary judgment on Plaintiffs' Trademark Infringement claim and Unfair Competition claim including:

(1) whether Entercom San Francisco's and Entercom Seattle's use of the phrase "Beat The Bank" is inherently distinctive; (2) whether, if the phrase is not inherently distinctive, Entercom San Francisco and Entercom Seattle are able to show that the phrase has acquired "secondary meaning" as to their use of the phrase; (3) whether the geographical limitations accorded to common law marks (assuming such rights are held by the Entercom Plaintiffs, which they are not) may - as a mater of fact - be extended from Seattle or San Francisco to Portland; (4) whether Entercom Portland has any right to enforce its exclusive license to the registered mark in Portland, or whether the license is "naked" and therefore unenforceable; and (5) whether Entercom Portland can establish a likelihood of confusion between Entercom Portland's use and Defendant Alpha's use of the phrase in Portland under the *Dawn Donut* rule.

For these reasons, the Court should deny Plaintiffs summary judgment motion on their Trademark Infringement and Unfair Competition claims.

DATED:  May 24, 2010.

TONKON TORP LLP


By /s/ Jon P. Stride
    Jon P. Stride, OSB No. 903887
     Direct Dial:  503.802.2034
     Fax:  503.972.3734
     E-mail:  jon.stride@tonkon.com
    Attorneys for Defendants Alpha Broadcasting, LLC,
    Larry Wilson, and Robert Proffitt

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DEFENDANTS ALPHA BROADCASTING, LLC, LARRY WILSON, AND ROBERT PROFFITT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on:

> Richard C. Hunt
> Barran Liebman LLP
> 2300 ODS Tower
> 601 SW Second Avenue,
> Portland, OR 97204-3159
>   Attorneys for Plaintiffs

> Keith A. Ketterling / Mark A. Friel
> Stoll Berne
> Suite 500
> 209 SW Oak Street
> Portland, OR  97204

> Michael E. Caples
> Fitzgerald Abbott & Beardsley LLP
> 1221 Broadway, 21st Floor
> Oakland, CA  94612
>   Attorneys for Defendant Scott Mahalick

☑   by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below;

☐   by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each attorney's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below;

☐   by causing a copy thereof to be hand-delivered to said attorneys at each attorney's last-known office address on the date set forth below;

☐   by e-mailing this document to each attorney's last-known e-mail address on the date set forth below.

DATED:  May 24, 2010.

    TONKON TORP LLP


    By /s/ Jon P. Stride_____
     Jon P. Stride, OSB No. 903887
     Attorneys for Defendants Alpha Broadcasting, LLC,
     Larry Wilson, and Robert Proffitt

035288/00001/2219612v1

PAGE 1 - CERTIFICATE OF SERVICE